**REVISED August 21, 2019**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-10228

United States Court of Appeals
Fifth Circuit

**FILED**
August 20, 2019

Lyle W. Cayce
Clerk

RANDY COLE; KAREN COLE; RYAN COLE,

Plaintiffs-Appellees

v.

CARL CARSON,

Defendant-Appellant

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

No. 15-10045

RANDY COLE; KAREN COLE; RYAN COLE,

Plaintiffs-Appellees

v.

MICHAEL HUNTER; MARTIN CASSIDY,

Defendants-Appellants

Appeals from the United States District Court
for the Northern District of Texas

**ON PETITION FOR REHEARING EN BANC FOLLOWING
REMAND FROM THE UNITED STATES SUPREME COURT**

No. 14-10228 c/w No. 15-10045

Before STEWART, Chief Judge, and HIGGINBOTHAM, JONES, SMITH, DENNIS, CLEMENT, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, COSTA, WILLETT, HO, DUNCAN, ENGELHARDT, and OLDHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge, joined by CARL E. STEWART, Chief Judge, and JAMES L. DENNIS, EDITH BROWN CLEMENT, JENNIFER WALKER ELROD, LESLIE H. SOUTHWICK, CATHARINA HAYNES, JAMES E. GRAVES, STEPHEN A. HIGGINSON, GREGG COSTA, and KURT D. ENGELHARDT, Circuit Judges:[1]

The Supreme Court over several years has developed protection from civil liability for persons going about their tasks as government workers in the form of immunity; not the absolute immunity enjoyed by prosecutors and judges, but a qualified immunity. Today we again repair to issues inherent in the qualification. The doctrine protects at the earliest stage of litigation at which the defense's application is determinable. To that end, courts have developed procedures and pretrial practices, including appellate review of pretrial denials, otherwise interlocutory and unappealable, and a reply to an answer under Rule 7(a) on order of the district court, particularized to address the defense of immunity in a motion to dismiss or for summary judgment. When those processes do not yield pretrial resolution, as with competing factual narratives, the full reach of qualified immunity gives way to a trial, the first point at which its application is determinable. And in obeisance to constitutional mandate, the worker's defense enjoys a right to the protection of a jury—long a bastion interposed between the state and person, and assured by the Founders. And it signifies that today the district judge has multiple

---

[1] Judges Higginbotham and Clement, now Senior Judges of this court, are participating as members of the original panel.

ways to present fully the claims and defenses to a jury to ensure the government worker a full draw upon his immunity defense,[2] including resolution of the competing factual narratives, one of which—or a meld of both—may foreclose liability.[3]

In this case, police officers from Sachse, Texas argue that the district court should have sustained their defense of qualified immunity on their pretrial motions to dismiss and for summary judgment. Ryan Cole and his parents Karen and Randy (collectively "the Coles") sue Officer Carl Carson, Lieutenant Martin Cassidy, and Officer Michael Hunter of the Sachse Police Department under 42 U.S.C. § 1983. The Coles allege that the officers violated Ryan Cole's Fourth and Fourteenth Amendment rights during an incident in which Cassidy and Hunter shot Ryan without warning, and then lied about what happened. The officers filed dispositive pretrial motions in the district court, asserting the defense of qualified immunity. The district court denied these motions, concluding that immunity could not be determined at this stage of the proceeding. In *Cole I*, a panel of our court affirmed the denial of summary judgment as to the Coles' Fourth Amendment excessive-force claim and the denial of the motion to dismiss the Coles' Fourteenth Amendment false-charge claim, but reversed denials of the motion to dismiss the Coles' Fourth Amendment and *Brady* claims attacking the alleged fabrication of evidence.[4]

---

[2] *See* FED. R. CIV. P. 49; Fifth Circuit Civil Pattern Jury Instructions 10.3. *See also McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000).

[3] In any treatment of the jury's role in stepping between state-afforded process and an individual defendant, it bears emphasis that the district judge can impanel a jury of at least six and as many as twelve members whose verdict, absent the parties' agreement otherwise, must be unanimous.

[4] *Cole v. Carson* ("*Cole I*"), 802 F.3d 752 (5th Cir. 2015), *vacated sub nom. Hunter v. Cole*, 137 S. Ct. 497 (2016).

No. 14-10228 c/w No. 15-10045

The Supreme Court vacated *Cole I*, and remanded for consideration in light of its intervening decision in *Mullenix v. Luna*.[5] On remand, the panel affirmed the denial of summary judgment as to the excessive-force claim. Because the Coles' other claims were unaffected by the reasoning of *Mullenix*, the panel reinstated *Cole I*'s holdings on the fabrication-of-evidence claims. We reheard this case en banc to reconsider disposition of the Coles' excessive-force claim in light of *Mullenix*.

We conclude that it will be for a jury, and not judges, to resolve the competing factual narratives as detailed in the district court opinion and the record as to the Coles' excessive-force claim. Limited by our jurisdiction to the materiality of factual disputes, we AFFIRM the denial of summary judgment on this claim and DISMISS Cassidy and Hunter's appeal. The Coles' remaining claims are unaffected by the reasoning of *Mullenix*, and so, as in *Cole I*, we AFFIRM denial of the motion to dismiss the Coles' Fourteenth Amendment false-charge claim; REVERSE denial of the motion to dismiss the Coles' Fourth Amendment and *Brady* fabrication-of-evidence claims based on qualified immunity; and return the case to the district court for trial and resolution of issues consistent with this opinion.

# I

## A.

On October 25, 2010, at around 10:30 a.m., the Sachse Police Department called available units to the neighboring town of Garland, Texas. There police were searching for Ryan Cole, a seventeen-year-old white male,

---

[5] *Hunter v. Cole*, 137 S. Ct. 497 (2016) (granting certiorari, vacating, and remanding for consideration in light of *Mullenix v. Luna*, 136 S. Ct. 205 (2015) (per curiam)).

4

reported to be walking in the neighborhood with a handgun. Officer Michael Hunter responded by proceeding immediately to the Garland neighborhood. In a statement given on the day of the incident, Hunter related that on arriving in the neighborhood, he overheard a civilian stating that Ryan had given up one of his guns, and that he had unsuccessfully tried to persuade Ryan to not keep his handgun. Hunter searched the area, and saw two officers following Ryan, who was walking away from them holding his gun to his head, approaching a wooded area along Highway 78. Although told by officers that things were under control, Hunter volunteered to go behind the wooded area and possibly intercept Ryan, and suggested that Officer Carl Carson, who was also present, join him.

Four years later, after this litigation had commenced, Hunter for the first time recalled that the civilian he had overheard had described an altercation with Ryan in which Ryan had threatened him. He also then for the first time recalled hearing police-radio transmissions indicating that officers were protecting nearby schools because of "[Ryan]'s dangerous conduct which posed a risk of serious harm to a great many innocent in the vicinity." Hunter otherwise learned nothing "that would cause [him] to believe [Ryan] was violent or wanted to hurt anyone."[6] Hunter understood that Ryan was suicidal, and, four years after the incident, he also raised the possibility that Ryan was using suicide as a pretext to evade the police.

Meanwhile, Lieutenant Martin Cassidy had also heard the original dispatcher's summons. Cassidy called the Sachse Police Department for more information. On the day of the incident, Cassidy swore that he learned "this

---

[6] In a 2014 declaration, Hunter stated that Cole refused a police officer's order to surrender his weapon. Hunter did not testify that he knew this fact at the time.

subject had shown up at [a] residence with a handgun and had just recently been seen walking away." But, four years later, after this litigation had commenced, like Hunter, Cassidy remembered learning more, including that Ryan "had threatened to shoot anyone who tried to take his gun"; had refused an order to drop his weapon; and might be headed for Sachse High School "to possibly engage in violence." Cassidy also decided to intercept Ryan on Highway 78.

The three officers separately arrived at the side of Highway 78 at around the same time. Hunter parked his motorbike and drew his duty weapon; Cassidy also drew his firearm and advised Carson to be ready to use his taser. The officers started walking along the tree line. A steep embankment rose from railroad tracks to the area along Highway 78. Ryan would have to climb this embankment to approach the tree line. Cassidy and Hunter used both the edge of the embankment and the vegetation to conceal themselves as they walked. Hunter also removed his white motorcycle helmet in order to be less conspicuous. Cassidy soon heard a message over the police radio: Ryan was ascending to the tree line. Hunter heard movement in the brush, and signaled to his colleagues.

What occurred next is disputed. Viewing the summary judgment evidence and drawing reasonable inferences in the light most favorable to the non-movant Coles, the district court determined that a reasonable jury could find the following: Ryan backed out from the tree line in front of Hunter and Cassidy, "unaware of the Officers' presence."[7] Ryan was holding his handgun

---

[7] *Cole v. Hunter*, 68 F. Supp. 3d 628, 645 (N.D. Tex. 2014). Viewing the evidence in a light most favorable to the Coles, the district court relied on the physical and audio evidence as interpreted by the Coles' expert crime-scene reconstructionist

pointed to his own head, where it remained.[8] "[Ryan] never pointed a weapon at the Officers,"[9] and "never made a threatening or provocative gesture towards [the] Officers."[10] "Officers [Cassidy and Hunter] had the time and opportunity to give a warning" for Ryan to disarm himself.[11] However, the officers provided "no warning . . . that granted [Ryan] a sufficient time to respond,"[12] such that Ryan "was not given an opportunity to disarm himself before he was shot."[13] Hunter and Cassidy then shot Ryan multiple times. Officer Hunter's first shot struck Ryan as he was oriented away from the officers at a 90-degree angle—that is, he was not facing Officer Hunter.[14] Following impact of the first shot, as Ryan's body turned or fell towards Hunter, he shot him a second time.[15] As an involuntary reflex to being shot, Ryan pulled the trigger, shooting himself in his temple.[16] But the officers did not know that.

Following the shooting, the three officers remained together at the scene. The Coles allege that during this time the officers conspired to insulate Cassidy and Hunter from liability with a fabricated narrative in which Ryan was facing Hunter and pointed his weapon at the officer, at which point Cassidy and

---

Thomas Bevel who opined that "no evidence . . . would indicate Mr. Cole was or could have been aware of the presence of the police officers prior to the time he was shot."

[8] *Cole*, 68 F. Supp. 3d at 644.

[9] *Cole*, 68 F. Supp. 3d at 644; *id.* at 645 ("[T]he evidence supports Plaintiffs' argument that Cole did not know of the Officers' presence.").

[10] *Cole*, 68 F. Supp. 3d at 645–46.

[11] *Id.* at 645. A reasonable jury could find the officers had up to five seconds during which they could have called out to Cole, sufficient time to make a warning according to Cole's expert.

[12] *Cole*, 68 F. Supp. 3d at 645.

[13] *Id.* 644–45 ("Cole was shot before he had an opportunity to disarm himself.").

[14] *Id.* at 644.

[15] *Cole*, 68 F. Supp. 3d at 644.

[16] *Id.*

Hunter fired on Ryan in defense. Eventually, members of the Garland Police Department arrived and took control of the scene, but did not follow the standard procedure of separating witnesses to ensure independent recollections. Instead, Cassidy and Hunter were allowed to return to their police station together. Later that day, the officers provided statements to investigators. Hunter stated that he had no chance to issue a command to Ryan. Cassidy and Carson, however, swore that, when Ryan backed out from the brush, they heard Hunter shout a warning to him. Hunter and Cassidy stated that Ryan then turned towards Hunter and pointed his handgun at Hunter, at which point both officers—fearing for Hunter's life—opened fire defensively.[17]

The Dallas County District Attorney presented the officers' narrative to a grand jury, which no-billed the officers and charged Ryan with felony aggravated assault of a public servant. As a result of the charge, Ryan, incapacitated in intensive care, was placed under house arrest. About a month after the indictment, investigators received a ballistics report from the crime lab. The ballistics analysis, taken together with stippling observed around Ryan's head wound, made clear that Ryan had shot himself in the temple, confounding the officers' account.[18] Dallas County prosecutors then dropped the aggravated assault charge, accepting Ryan's plea to misdemeanor unlawful carry of a weapon, a $500 fine, and forfeiture of his handgun.

Ryan suffered permanent injuries, including cognitive impairment, partial paralysis, and other serious mental and physical disabilities.

---

[17] Carson stated he could not see Cole's movement because Hunter obstructed his line of sight.

[18] Stippling refers to a discoloration of the skin caused by hot gases and residue released immediately around a discharging firearm.

No. 14-10228 c/w No. 15-10045

B.

The Coles brought, inter alia, four Section 1983 claims against the officers. First, they allege a violation of Ryan's Fourth Amendment right against the use of excessive force arising from the shooting. Second, the Coles allege a violation of Ryan's Fourteenth Amendment right against the imposition of false charges arising from the fabrication of evidence. Third, they allege a violation of Ryan's Fourth Amendment right against unreasonable seizures arising from the fabrication of evidence. Fourth, they allege a *Brady* violation arising from the fabrication of evidence. The officers filed a motion to dismiss these claims under Rule 12(b)(6), asserting qualified immunity defenses. The district court denied the motion in a January 2014 Memorandum Opinion and Order.[19] Carson alone appealed the denial of the motion to dismiss the Coles' three fabrication-of-evidence claims based on qualified immunity. The district court stayed these fabrication-of-evidence claims pending Carson's appeal, allowing the Coles limited discovery against Cassidy and Hunter's qualified immunity defenses to the excessive-force claim. With that discovery complete, the two officers moved for summary judgment, rearguing qualified immunity. The district court denied their motion and Cassidy and Hunter appealed.

The officers' appeals were consolidated. In 2015, in *Cole I*, a panel of this court affirmed the district court's denial of summary judgment on the Coles' excessive-force claim, affirmed denial of the motion to dismiss the Coles'

---

[19] The Coles filed an initial complaint in September 2012. The officers moved to dismiss or in the alternative requested that the district court order a Rule 7(a) reply to the immunity defense. The district court then afforded the Coles opportunity to file a Rule 7 reply or amended complaint. The Coles filed an amended complaint. The officers then filed a second motion to dismiss.

Fourteenth Amendment false-charge claim, and reversed the denial as to the Coles' Fourth Amendment and *Brady* fabrication-of-evidence claims, finding the qualified immunity defense applicable for these claims. The officers petitioned the Supreme Court for a writ of certiorari. In November 2016, the Supreme Court granted certiorari, vacated the panel's judgment, and remanded the case for further consideration in light of *Mullenix v. Luna*,[20] decided in the intervening time.[21]

On remand from the Supreme Court, recognizing that its jurisdiction was limited to determining the materiality of factual disputes that the district court determined were genuine, the panel once again held that the applicability of qualified immunity for Cassidy and Hunter could not be determined at the summary judgment stage.[22] Finding the Supreme Court's remand order reached no further, the panel reinstated the *Cole I* opinion on the Coles' three fabrication-of-evidence claims.[23] The officers moved for rehearing en banc, which we granted.[24]

---

[20] 136 S. Ct. 305 (2015).

[21] As this court and others have acknowledged, when the Supreme Court grants, vacates, and remands ("GVRs") a case, it does not make a decision on the merits of the case nor dictate a particular outcome. *See Diaz v. Stephens*, 731 F.3d 370, 378 (5th Cir. 2013); *Kenemore v. Roy*, 690 F.3d 639, 641–42 (5th Cir. 2012); *see also Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013); *Gonzalez v. Justices of Mun. Court of Bos.*, 420 F.3d 5, 7 (1st Cir. 2005).

[22] *Cole v. Carson*, 905 F.3d 334, 347 (5th Cir. 2018), *reh'g granted,* 915 F.3d 378, 379 (5th Cir. 2019).

[23] *Id.* at 341–42.

[24] *Cole,* 915 F.3d at 379.

No. 14-10228 c/w No. 15-10045

## II

## A.

We hear this case on remand from the Court for further consideration in light of *Mullenix*. We do not reach issues unaddressed by the mandate on remand,[25] and so we hold as in *Cole I* with respect to the Coles' three fabrication-of-evidence claims. First, we affirm the district court's denial of the motion to dismiss the Coles' Fourteenth Amendment claim regarding the imposition of false charges.[26] Second, finding qualified immunity applicable, we reverse the denial of the motion to dismiss the Coles' claim that the alleged fabrication of evidence violated the Fourth Amendment.[27] Lastly, finding qualified immunity applicable, we reverse the denial of the motion to dismiss the Coles' claim that the alleged fabrication of evidence entailed a *Brady* violation.[28]

---

[25] Appellants argue that the Supreme Court's 2017 decision in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), changes the legal landscape and justifies revisiting the Coles' Fourteenth Amendment false-charge claim. *Manuel* holds that "pretrial detention can violate the Fourth Amendment not only when it precedes, but also when it follows, the start of legal process in a criminal case," and, therefore, that the plaintiff in that case "stated a Fourth Amendment claim when he sought relief not merely for his (pre-legal-process) arrest, but also for his (post-legal-process) pretrial detention." *Manuel*, 137 S. Ct. at 918–19. It does not hold that the Fourth Amendment provides the exclusive basis for a claim asserting pre-trial deprivations based on fabricated evidence. We have already so determined in *Jauch v. Choctaw County*: "*Manuel* does not address the availability of due process challenges after a legal seizure, and it cannot be read to mean, as Defendants contend, that *only* the Fourth Amendment is available to pre-trial detainees." *Jauch v. Choctaw Cty.*, 874 F.3d 425, 429 (5th Cir. 2017), *cert. denied sub nom. Choctaw Cty. v. Jauch*, 139 S. Ct. 638 (2018).

[26] *See Cole I*, 802 F.3d at 766–74.

[27] *See id.* at 764–65.

[28] *See id.* at 765.

11

B.

The qualified immunity inquiry includes two parts. In the first we ask whether the officer's alleged conduct has violated a federal right; in the second we ask whether the right in question was "clearly established" at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct.[29] The officer is entitled to qualified immunity if there is no violation, or if the conduct did not violate law clearly established at the time.[30]

On an appeal of a denial of summary judgment on the basis of qualified immunity, our jurisdiction is limited to examining the materiality of factual disputes the district court determined were genuine.[31] "[I]n an interlocutory appeal we cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true."[32] "[W]e lack jurisdiction to resolve the genuineness of any factual disputes" and "consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment."[33] Like the district court, we must view the facts and draw reasonable inferences in the light most favorable to the plaintiff and ask whether the defendant would be entitled to qualified

---

[29] *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam).

[30] *Id.*

[31] *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 408 (5th Cir. 2009); *see also id.* ("If the determination of qualified immunity would require the resolution of a genuinely disputed fact, then that fact is material and we lack jurisdiction over the appeal.").

[32] *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc)).

[33] *Id.* (internal quotations omitted).

immunity on those facts.[34] The Supreme Court has summarily reversed this court for failing to take the evidence and draw factual inferences in the non-movants' favor at the summary judgment stage.[35] In doing so, the Court emphasized that the requirement is no less binding "even when . . . a court decides only the clearly-established prong of the standard."[36] Within the limited scope of our inquiry, review is de novo.[37]

As instructed, we turn to the guidance provided by the Supreme Court in *Mullenix*. In that case, the Court reviewed a denial of qualified immunity to an officer who had shot and killed a fugitive in a car chase. This court had decided that the officer violated the clearly established rule that deadly force was prohibited "against a fleeing felon who does not pose a sufficient threat of harm to the officer or others."[38] The officer in *Mullenix* reasonably perceived some threat of harm, but we had held the threat was not "sufficient." The Supreme Court reversed our decision. It found that the rule we articulated lacked a referent to define the "sufficiency" of threats.[39] Precedents provided a "hazy legal backdrop," at best.[40] Given these deficient sources, an officer could not reasonably derive an applicable rule to govern his or her conduct in the situation.[41] Finding that we had defined the applicable rule with too much

---

[34] *Lytle,* 560 F.3d at 409.

[35] *Tolan*, 572 U.S. at 660.

[36] *Id.* at 657.

[37] *Trent*, 776 F.3d at 376.

[38] *Mullenix*, 136 S. Ct. at 308–09 (internal quotation marks omitted).

[39] *Id.* at 309.

[40] *Id.* at 309–10.

[41] *Id.*

13

"generality,"[42] the Court reversed our holding that the officer had violated clearly established law.[43]

Under *Mullenix*, application of clearly established law is undertaken with close attention to the relevant legal rule and the particular facts of the case. Here, based on the facts taken in the light most favorable to the non-movant Coles, and with reasonable inferences drawn in their favor, the district court determined there were genuine factual disputes as to Ryan's and the officers' conduct, upon which a reasonable jury could find "[Ryan] . . . did not pose an immediate threat to the officers" when they opened fire.[44] It held that "on October 25, 2010, the date of the shooting, the law was clearly established" that "shooting a mentally disturbed teenager, who was pointing a gun the entire time at his own head and facing away from the officer, in an open outdoor area, and who was unaware of the officer's presence because no warning was given prior to the officer opening fire, was unlawful."[45] As we will detail, the officers ask us to consider a different set of facts, but we cannot do so. We lack jurisdiction to reconsider the district court's factual determinations on an appeal from denial of summary judgment on qualified immunity.

*Tennessee v. Garner* announced the principle that the use of deadly force is permitted only to protect the life of the shooting officer or others: "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly

---

[42] *Id.* at 311.
[43] *Id.* at 312.
[44] *Cole*, 68 F. Supp. 3d at 645.
**[45]** *Id.* at 643**.**

force to do so."[46] *Garner* also requires a warning before deadly force is used "where feasible,"[47] a critical component of risk assessment and de-escalation. The Supreme Court has repeatedly stated that this rule can be sufficient in obvious cases, and this court has applied it in such cases, without dependence on the fact patterns of other cases.[48]

The summary judgment facts, as determined by the district court, are that Ryan posed no threat to the officers or others to support firing without warning. The "Officers had the time and opportunity to give a warning and yet chose to shoot first instead."[49] This is an obvious case. Indeed, Officer Hunter conceded that he would have had no basis to fire upon Ryan unless Ryan had been facing him and pointing a gun at him.

This case is obvious when we accept the facts as we must. It is also informed by our precedent. Before 2010, *Baker v. Putnal* established clearly that Cassidy's and Hunter's conduct—on the facts as we must take them at this stage—was unlawful. For in *Baker*, members of the public told Officer Michael Putnal, a police officer patrolling a crowded Galveston beach area during spring break, that "someone had entered the crowd with a pistol-gripped shotgun."[50] Minutes later, Officer Putnal heard gunfire and saw the

---

[46] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

[47] *Id.* at 11–12; *see also Colston v. Barnhart*, 130 F.3d 96, 100 (5th Cir. 1997).

[48] *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 277–78 (5th Cir. 2015); *cf. Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012).

[49] *Cole*, 68 F. Supp. 3d at 645.

[50] *Baker v. Putnal*, 75 F.3d 190, 193 (5th Cir. 1996).

crowd scurrying.[51] There was "a good deal of confusion on the beach."[52] Two people directed the officer to a car in which the gunman was supposedly sitting.[53] Putnal then saw Wendell Baker Jr. and another man sitting in a truck parked on the beach.[54] The parties disputed what happened next. Putnal stated he saw Baker loading a magazine into a handgun, that he warned Baker to freeze or drop the gun, that Baker instead turned the gun upon Putnal, at which point Putnal fired, killing Baker.[55] However, witnesses "state[d] that [Baker] took no threatening action . . . as the officer approached the truck," that Putnal issued no warning to Baker, and that "Baker . . . may have barely had an opportunity to see Putnal before [the officer] fired his gun."[56] The parties did not dispute that Putnal had been searching for a gunman, and that a gun had been recovered from Baker's seat, although they disputed whether and how Baker had been holding it, that is, whether he pointed it at Putnal.[57] It was also undisputed that Baker was turning to face Putnal from his seat, although medical reports indicated from "the nature of the wounds . . . that Baker . . . was not facing Putnal when he was shot."[58] Baker's survivors sued the officer, bringing, inter alia, a Fourth Amendment excessive-force claim.[59] The district court granted Putnal qualified immunity, crediting his account

---

[51] *Id.*
[52] *Id.* at 198.
[53] *Id.* at 193.
[54] *Id.*
[55] *Id.* at 198.
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.* at 193.

16

that he had fired in response to Baker turning and aiming the gun at him.[60] On appeal, we reversed and remanded the excessive-force claim for trial.[61] Recognizing the dispute as to the officer's warning, Baker's turn, and the position of Baker's gun, we found "simply too many factual issues to permit the Bakers' § 1983 claims to be disposed of on summary judgment."[62] "Chaos on the beach and Baker['s] mere motion to turn and face Putnal are not compelling reasons to find that [the officer's] use of force was not excessive as a matter of law."[63] Viewing the facts and drawing inferences "in the light most favorable to the nonmoving party," we held that "[t]he number of shots and the nature of the wounds raise . . . more of a question of fact than a court may dispose of on summary judgment."[64]

The Supreme Court's more recent qualified immunity decisions do not shift this analysis. In *Kisela v. Hughes*, police officers in Tucson, Arizona responded to a call that a woman was behaving erratically with a knife and that she had been hacking at a tree.[65] When officers arrived on scene, the suspect, Amy Hughes, emerged from a house holding a large kitchen knife, and approached to within "striking distance" of a bystander in the driveway.[66] One of the officers, Andrew Kisela, whose further approach was impeded by a chain-link fence, repeatedly ordered Hughes to drop the knife, but Hughes did not

---

[60] *Id.* at 197.
[61] *Id.* at 198.
[62] *Id.*
[63] *Id.*
[64] *Id.* at 198–99.
[65] *Kisela v. Hughes*, 138 S. Ct. 1148, 1151 (2018) (per curiam).
[66] *Id.*; *id.* at 1154.

follow his commands.[67] Kisela then fired on Hughes through the fence.[68] Hughes brought a Section 1983 excessive force claim against Kisela.[69] Reviewing a denial of qualified immunity to Kisela, the Supreme Court held that, in light of the officer's limited knowledge of the situation and Hughes's refusal to follow his repeated commands to drop the knife while within striking distance of the bystander—obstinance that heightened the risk of immediate harm to another—the law did not clearly establish that the officer's resort to deadly force was unlawful.[70]

In this case, Officers Cassidy and Hunter found themselves in a search for a suicidal teenager who they knew had already encountered fellow officers and walked away from them with his gun to his head, non-responsive, but without aggressive action. The circumstances of the officers' encounter with Ryan, as in *Baker*, remain heavily disputed: as to whether Ryan was aware of the officers, whether and how he turned and aimed his gun, and whether Hunter warned Ryan to disarm himself. The district court here defined the facts in a 21-page opinion, finding genuine disputes regarding these facts, and, viewing these disputes in a light most favorable to the Coles, concluded that a reasonable jury could find that Ryan made no threatening or provocative gesture to the officers and posed no immediate threat to them. Unlike in *Kisela*, where the officer repeatedly warned an armed suspect to disarm, yet that suspect, facing the officer and hearing his warnings, refused to disarm, here the district court concluded that a reasonable jury could find Cassidy and

---

[67] *Id.* at 1151.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 1153.

Hunter opened fire upon Ryan without warning, even though it was feasible. On these facts, the officers' conduct violates clearly established law.

Rather than engage on the facts as we must take them at the summary judgment stage, the officers repeatedly argue from a different set of facts. While the district court found that Ryan was initially facing away from the officers when they fired the first shot, the officers now describe his "armed turn towards Officer Hunter." While the district court found that Ryan kept his gun aimed at his own head and never pointed it at the officers, the officers now suggest that Ryan's gun was "below his head," moving towards Hunter, and then only momentarily turned back towards Ryan's head at the moment he fired (ignoring Hunter's sworn statement that he fired only when the gun was pointed toward him—a story prosecutors accepted until a ballistics report exposed its impossibility). And although the district court found that Ryan was not given an opportunity to disarm himself, the officers contend that he was warned to disarm before being shot. "Had the Officers delayed longer, reaction time lag would have precluded their ability to stop [Ryan] from shooting Officer Hunter," they argue. Based on this alternative set of facts, echoed again in oral argument to us as a full court, and in the teeth of those found by the district court, the officers now contend Ryan posed a "deadly threat," and no clearly established law in 2010 put the officers' response of firing in self-defense beyond the law.

The Coles and amicus Cato Institute are correct that it is beyond our jurisdiction to consider the officers' set of facts, a narrative evolving over time. "[I]f an excessive force claim turns on which of two conflicting stories best captures what happened on the street," the caselaw "will not permit summary

judgment in favor of the defendant official. . . . [A] trial must be had."[71] Whereas the officers will have a chance to present their factual narrative—and to question the Coles'—at trial, they cannot contest the facts in the current appeal.[72]

The dissents also take issue with the disputed facts. Judge Duncan focuses on what he terms "undisputed pre-encounter events." But, particularly in light of the officers' evolving stories, it is disputed whether any of the events recounted were known to Hunter or Cassidy when they fired on Ryan. The dissent cites to the reports and affidavits of other officers and individuals to describe the events occurring before Hunter and Cassidy were called to the scene.[73] But looking at the evidence in the light most favorable to the Coles, Hunter and Cassidy were not aware of the disturbance at the Coles' house the previous night, the alleged cache of weapons left at the Reeds' house, Ryan's alleged suicidal threat, or his threat to shoot anyone who came near him.

And of course, what matters is what the defendant officers knew when they shot Ryan. *See, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam) ("Because this case concerns the defense of qualified immunity . . . the Court

---

[71] *Saucier v. Katz*, 533 U.S. 194, 216 (2001) (Ginsburg, J. concurring). *see also Tolan*, 572 U.S. at 660; *id.* at 662 (Alito, J., joined by Scalia, J., concurring in the judgment) (agreeing that "summary judgment should not have been granted" in that case because of the genuine issues of material fact); *Lytle*, 560 F.3d at 408–09.

[72] *Cf. Tolan*, 572 U.S. at 660 ("The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [the plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.").

[73] Recall that Hunter was a late-arriving officer who was not instructed by the Sachse or Garland police departments to pursue Ryan. *See supra* at 4.

considers only the facts that were knowable to the defendant officers."); *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015) (stressing that "a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer"). The dissents overlook the fundamental reason most of these facts should not be part of the analysis: we consider only what the officers knew at the time of their challenged conduct. "Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam); *see also Brown v. Callahan*, 623 F.3d 249, 253 ("An official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight." (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989))). Despite the many "red flags" listed by the dissents as known to others, only those known to Hunter and Cassidy are relevant to the qualified immunity analysis.

Judge Jones's dissent fares no better in addressing some of the key facts of the shooting itself. Contrary to its assertion, the district court found that Ryan was facing at a 90-degree angle away from the officers when he was first shot. *Cole*, 68 F. Supp. 3d at 644. As for the "warning," the district court found that a reasonable jury could conclude that Ryan "was not given an opportunity to disarm himself before he was shot." *Id.* Relitigating the district court's assessment of factual disputes is not our role on interlocutory review.

What Hunter and Cassidy knew before shooting at Ryan, whether they warned him before doing so, and what actions Ryan took before being shot are all disputed. The district court must afford Cassidy and Hunter qualified immunity at the earliest point the defense's applicability is determinable. Here, we have not yet reached that point. It will be for a jury to resolve what

happened on October 25, 2010. The district court did not err in denying the officers qualified immunity at the summary judgment stage.

## III

The district court determined that genuine disputes of fact regarding Cassidy's and Hunter's entitlement to qualified immunity remain. We AFFIRM the district court's denial of summary judgment on the Coles' excessive-force claim and DISMISS Cassidy and Hunter's appeal; AFFIRM denial of the motion to dismiss the Coles' Fourteenth Amendment false-charges claim; REVERSE denial of the motion to dismiss the Coles' Fourth Amendment and *Brady* fabrication-of-evidence claims; and return the case to the district court for trial and resolution of issues consistent with this opinion.

No. 14-10228 c/w No. 15-10045

JENNIFER WALKER ELROD, Circuit Judge, joined by CARL E. STEWART, Chief Judge, and EDITH BROWN CLEMENT, CATHARINA HAYNES, STEPHEN A. HIGGINSON, GREGG COSTA, and KURT D. ENGELHARDT, Circuit Judges, concurring:

I concur fully in the majority opinion.    Despite the outcry of the dissenting opinions, there is no new law being made or old law being ignored. The majority opinion takes no position on the public policy issues of the day regarding policing and the mentally ill.   Rather, it follows the longstanding *en banc* rule that "we lack jurisdiction to review the *genuineness* of a fact issue" on an interlocutory appeal of a denial of summary judgment based on qualified immunity.   *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (*en banc*) (quoting *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016)); *Kinney v. Weaver*, 367 F.3d 337, 341, 346–47 (5th Cir. 2004) (*en banc*).   As the able district court determined, the facts are very much in dispute.

No. 14-10228 c/w No. 15-10045

EDITH H. JONES, Circuit Judge, joined by SMITH, OWEN, HO, DUNCAN and OLDHAM, Circuit Judges, dissenting:

What "clearly established law" says that only a rogue cop would have shot at this mentally disturbed teenager within 3 to 5 seconds as the teen emerged from dense bushes ten to twenty feet away from Officer Hunter and, with his finger on the trigger of a loaded pistol pointed in the direction of his own head, began turning in the officer's direction?  The majority state this is an "obvious case" for the denial of qualified immunity:  the officers could not shoot without first announcing themselves to Cole or looking down the barrel of his gun.  What is so obvious?  Contrary to the majority's dangerously unrealistic proposition, "action beats reaction" every time. *Ontiveros v. City of Rosenberg,* 564 F.3d 379, 384 (5th Cir. 2009).  Neither we nor the Supreme Court has ever held that police officers confronted in close quarters with a suspect armed and ready to shoot must hope they are faster on the draw and more accurate.  The increasingly risky profession of law enforcement cannot put those sworn to "serve and protect" to a *Hobson*'s choice: place their lives on the line by heroic forbearance or risk their financial security in defense of lawsuits.  The Supreme Court has repeatedly stated in plain terms that the purpose of qualified immunity is to prevent precisely this quandary.

Respectfully dissenting, we are convinced that the Supreme Court's remand from the original panel opinion denying immunity meant something; the governing Supreme Court law is foursquare in the corner of

24

No. 14-10228 c/w No. 15-10045

Officers Hunter and Cassidy; and they were entitled to receive summary judgment confirming their immunity from suit, not simply from liability.[1]

## I. Background

### A. Undisputed facts

The majority opinion paints a picture of the relevant facts that has evolved considerably from the first and second panel opinions to this final majority version. *Compare Cole v. Carson,* 802 F.3d 752, 755-56, 758 (5th Cir. 2015), *vacated sub nom. Hunter v. Cole,* 137 S. Ct. 497 (*Cole I*), *with Cole v. Carson,* 905 F.3d 334, 337-340 (5th Cir. 2018) (*Cole II*), *and supra.* Qualified immunity for the use of deadly force is assessed at the moment a law enforcement officer confronts a suspect, *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989), but the officer's understanding of facts leading up to the event color the question whether "a reasonable officer" could have believed his life or the lives of others were endangered. *White v. Pauly*, 137 S. Ct. 548, 550, 552 (2017). To the majority's picture, it is necessary to add undisputed facts recited in the prior opinions and undisputed evidence from plaintiffs' experts. Hornbook summary judgment law holds that although disputed facts are viewed in the light most favorable to non-movants, the entire record must be considered. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007). Further, this court reviews *de novo* the materiality of the relevant facts. *Foley v. Univ. of Houston, Sys.,* 355 F.3d 333, 337 (5th Cir. 2003).

---

[1] We do not challenge the majority's decision to leave in place fabricated evidence charges against these two officers and Officer Carson. Only Carson, who was present at the encounter but did not shoot, appealed the district court's refusal to dismiss that claim. The Supreme Court has not been clear on the constitutional basis for such a claim, so we have no ground to criticize the majority. *Compare Manuel v. City of Joliet,* 137 S. Ct. 911 (2017)*, with McDonough v. Smith,* 139 S. Ct. 2149 (2019), (refusing to rule on the constitutional grounding of such claims).

First, both officers who shot at Cole were aware that he had mental issues. Officer Cassidy had learned that Cole "had threatened to shoot anyone who tried to take his gun and had refused an order to drop his weapon." *Cole II*, 905 F.3d at 338. Officer Hunter watched Cole walk steadily down the train tracks ignoring other police who were yelling at him to stop and put down his 9 mm semi-automatic pistol. Both officers were aware that a bulletin had been disseminated about Cole to all law enforcement in Garland and Sachse, and three nearby schools in the vicinity of Highway 78, where Cole was heading, were being protected. *Cole II*, 905 F.3d at 337-38.

Second, Cole emerged from the vegetation, unaware of the officers' presence, within ten to twenty feet of Officer Hunter, and as he turned toward the officers, three to five seconds elapsed. That's less time than it takes to read the preceding sentence. Cole initially stood at a 90 degree angle to the police and then began turning counterclockwise toward them. His movement is conceded by plaintiffs' expert, supported by the ballistic evidence, and recounted in the district court opinion. *Cole II*, 905 F.3d at 338 ("Cole began to turn counterclockwise."). Plaintiff's expert opines this interval was sufficient for the officers to command Cole to disarm and observe his reaction.

Third, his loaded pistol was pointed within thirty inches toward his head, *Cole I*, 802 F.3d at 756, and Cole's finger was on the trigger.

Next, the officers fired seven shots, two of which hit Cole. Officer Hunter's first shot hit Cole in the left arm, penetrating his body from the left. Another of Hunter's shots merely grazed Cole's left arm as he continued to turn and was facing Hunter. *Cole II*, 905 F.3d at 339. Cole's gun, according to the plaintiffs, involuntarily discharged and hit him in the head, "leaving stippling—gunpowder residue around the wound due to the gun being fired from less than thirty inches away." *Cole I*, 802 F.3d at 756.

Finally, the bodycam evidence shows that some officer began to issue a warning at about the time the shooting started. *Cole II*, 905 F.3d at 338.

## B. Prior panel reasoning

The district court denied qualified immunity to Hunter and Cassidy for the shooting[2] and refused to dismiss the allegations of falsified evidence against Hunter, Cassidy, and Carson.

The original panel opinion affirmed,[3] concluding as to the excessive force allegation that "if the Coles' version of the evidence is believed, it was not objectively reasonable to use deadly force against Ryan Cole when the teenager emerged on foot from the wooded area with a gun to his own head and turned left." With regard to immunity, the panel held that by October 2010, "reasonable officers were on notice that they could not lawfully use deadly force to stop a fleeing person who did not pose a *severe and immediate risk to the officers or others,* and they had many examples of the sorts of threatening actions which could justify deadly force. Turning left while unaware of an officer's presence is not among them." *Cole I*, 802 F.3d at 762 (emphasis added) (footnote omitted). The panel's principal support for its legal reasoning was *Luna v. Mullenix*, 773 F.3d 712 (5th Cir. 2014), *rev'd sub nom. Mullenix v. Luna,* 136 S. Ct. 305 (2015). According to the panel, "the central [disputed] issue" is "whether Ryan pointed his gun at Officer Hunter." *Cole I*, 802 F.3d

---

[2] Query why Officer Cassidy, whose shots didn't hit the victim, can be sued? This court has held that qualified immunity must be applied individually to each defendant. *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007). But no one raised the point here.

[3] The correct disposition if this court agrees there are material fact issues in dispute regarding qualified immunity would be to dismiss the appeal, because our appellate jurisdiction exists only over questions of law. *Mitchell v. Forsyth,* 472 U.S. 511, 529-30, 105 S. Ct. 2806, 2816-17 (1985).

at 762.   Absent such a threatening gesture, Cole was said to present no sufficient threat.  *Id.*

The next panel opinion was formulated after the Supreme Court reversed us in *Mullenix* on the grounds that "none of our [the Supreme Court's own] precedents 'squarely governs' the facts here.   Given [the suspect's] conduct, we cannot say that only someone 'plainly incompetent' or who 'knowingly violate[s] the law' would have perceived a sufficient threat and acted as [the officer] did." 136 S. Ct. at 310.  On this second go-round, the panel conceded the deficiency of the "no sufficient threat" rule, but then concluded that, taken in the light most favorable to the plaintiffs, Cole's conduct posed "no threat" when he was shot, *Cole II*, 905 F.3d at 343, and the officers therefore violated a clearly established "no threat" rule.  *Tennessee v. Garner* is cited as the basis for this "bright line" rule.[4]   471 U.S. 1, 105 S. Ct. 1694 (1985).  This opinion was vacated by a vote to reconsider the case en banc.

**C.  The Current Majority Opinion**

Pivoting yet again, the en banc majority opinion commences with a paean to "the worker's . . . right to the protection of a jury," not even bothering to cite Supreme Court authorities that explain why qualified immunity is immunity from suit, not just liability.  The majority opinion omits or ignores material undisputed facts recited above—the knowledge of the officers, Cole's turning toward them, the significance of his finger in a loaded pistol, and the

---

[4] The panel curiously described so-called clearly established law in both of its opinions with references to unpublished, non-precedential Fifth Circuit cases.  The Supreme Court has expressed uncertainty over whether any circuit court cases, as opposed to its own decisions, may set out "clearly established law."  *See Dist. of Columbia v. Wesby,* 138 S. Ct. 577, 591 n. 8 (2018); *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014); *Reichle v. Howards*, 566 U.S. 658, 665-66, 132 S. Ct. 2088, 2094 (2012).  It is incredible that this court would cite our avowedly non-precedential decisions for that purpose.

28

three to five second interval—and hides behind the assertion that, relevant to qualified immunity, there are "genuine factual disputes as to Ryan's and the officers' conduct" such that a reasonable jury could find that Cole posed no "immediate threat" to the officers or others.  Two paragraphs later, asserting that Cole posed "no threat . . . to support firing without warning," the majority deem this an "obvious case" for denial of immunity, because the "officers had time and opportunity to give a warning and yet chose to shoot first instead." The "obvious case" rationale again derives, in the majority's view, from *Garner*, fortified only by one Fifth Circuit case and the Supreme Court's decision in *Kisela v Hughes*.[5]

## DISCUSSION

The only legal question that needs to be addressed by this court is whether, under the circumstances of this five-second confrontation, *every* reasonable police officer would have reasonably perceived *no* life-threatening danger such that deadly force could be used to incapacitate Cole without a preliminary warning.  Put otherwise, as a matter of law, was it clearly established that officers may not fire on a suspect, armed and ready to shoot a pistol, who is turning in their direction with one of their brethren ten to twenty feet away, unless the gun barrel points at them or they first shout a warning and await his response?

The majority deny qualified immunity, seeming to answer on the basis of "disputed fact issues" that Cole posed "no threat."  The majority's reasoning

---

[5] This dissent focuses on the majority opinion because Appellees' briefing offered nothing in addition to the meager authorities cited by the majority to support their "clearly established law" theory.

is at too high a level of generality. And the majority ignore the critical criterion for qualified immunity in Fourth Amendment cases: the reasonableness of the officers' reasonable perceptions. In sum, the majority here double down on the mistakes that got our court reversed in *Mullenix*.[6]

Before discussing these problems in detail, it is necessary to recapitulate the reasoning behind the Supreme Court's qualified immunity cases. The majority's bare mention of the standards for qualified immunity ignores the Court's rationale for the defense. Beginning with *Monroe v. Pape* in 1961, the Supreme Court unleashed federal courts to enforce constitutional commands against state actors pursuant to 42 U.S.C. § 1983. *See Monroe v. Pape*, 365 U.S. 167, 187, 81 S. Ct. 473, 484 (1961). A foreseeable consequence of facilitating such lawsuits was that a deluge of litigation would follow, at least some of it ill-founded or frivolous. What was to be done to limit claims to those that might have merit? The Court decided in *Pierson v. Ray* that police officers sued under Section 1983 should enjoy qualified immunity accorded at common law. 386 U.S. 547, 556-57, 87 S. Ct. 1213, 1219 (1967).

For over fifty years, the Court has developed the standards of qualified immunity, well aware from the beginning that "the local police officer" is "that segment of the executive branch . . . that is most frequently and intimately involved in day-to-day contacts with the citizenry, and hence, most frequently exposed to situations which can give rise to claims under Sec. 1983 . . . ." *Scheuer v. Rhodes*, 416 U.S. 232, 244-45, 94 S. Ct. 1683, 1691-92 (1974). The

---

[6] In *Mullenix,* the Supreme Court reversed this court and held an officer entitled as a matter of law to qualified immunity when he shot, and killed, a suspect fleeing from the police in his car at high speed. Following *Mullenix,* the Supreme Court vacated the judgment and remanded *Cole I,* no doubt in part because *Cole I* heavily relied on the reversed panel decision in *Mullenix.*

breadth of this shield represents a deliberate balance between affording a damages remedy for constitutional abuses and the social and personal costs inflicted by meritless claims. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038 (1987). The costs to society include the costs of litigation, the diversion of limited public resources, the deterrence of able people from going into public service, and the danger that fear of being sued will discourage officials from vigorously performing their jobs. *Id.*; *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736 (1982). The devastating costs imposed by unfounded lawsuits on officers otherwise entitled to immunity are reputational, potentially employment-related, financial and emotional. For these reasons, the Court has repeatedly explained that qualified immunity shields public officials not just from liability but from suit. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985); *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) ("Qualified immunity is lost if a case is erroneously permitted to go to trial."). Some in the lower federal courts may disapprove of the Court's half century of authorities, but we may not functionally disregard them.

Nearly as venerable as the general defense of qualified immunity are the decisions applying it to Fourth Amendment claims against law enforcement officers. *Anderson v. Creighton* affirmed in 1987 that a law enforcement officer who participates in a warrantless search may be entitled to qualified immunity "if he could establish as a matter of law that a reasonable officer could have believed the search to be lawful." 483 U.S. at 638, 107 S. Ct. at 3038. Justice Scalia's opinion reminded that "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). In determining the objective legal reasonableness of the allegedly unlawful action, "[i]t should not be surprising . . . that our cases

establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S. Ct. at 3039.

Two years later, the Court clarified that for alleged Fourth Amendment excessive force violations, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872. The calculus of "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97, 109 S. Ct. at 1872. Ultimately, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." *Id.* at 397, 109 S. Ct. at 1872. Quoting these statements from *Graham*, the Court later explained that the test for qualified immunity for excessive force "has a further dimension" in addition to the deferential, on-the-scene evaluation of objective reasonableness. *Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158 (2001). Justice Kennedy explained: "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* "Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206, 121 S. Ct. at 2158 (internal citation and quotation marks omitted).

No. 14-10228 c/w No. 15-10045

Evaluating the qualified immunity defense is thus a two-step process. The first is to determine whether the Fourth Amendment has been violated by conduct that, viewed from the officer's perspective and information at the time, is objectively unreasonable.[7]  The second step assesses the objective legal reasonableness of the action, that is, whether every reasonable officer would have known that the conduct in question was illegal.  *See Pearson*, 555 U.S. at 232, 129 S. Ct. at 815-16.  The illegality must have been apparent, as held in cases that are factually similar to the situation confronting the officer.  *White,* 137 S. Ct. at 542.  Immunity must be granted to all but the plainly incompetent or those who knowingly violate the law.  The Supreme Court has enforced immunity where officers acted negligently, *Anderson,* 483 U.S. at 641, 107 S. Ct. at 3039-40; or when they could have used another method to subdue a suspect, *Mullenix,* 136 S. Ct at 310; or when the law governing their behavior in particular circumstances is unclear.  *White,* 137 S. Ct. at 552.  The Court emphasizes that the specificity of the applicable "clearly established" rule is especially important in Fourth Amendment cases.  *Mullenix,* 136 S. Ct. at 308.

By denying plaintiffs their "day in court" at a preliminary stage, qualified immunity operates as a counterintuitive, albeit vital, defense.  Thus, the Supreme Court has regularly reversed denials of qualified immunity where lower courts misapplied the standards.  *See Wesby v. District of Columbia,* 816 F.3d 96, 102 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) (citing eleven Supreme Court cases in five years reversing lower courts in the qualified immunity context including *Mullenix v. Luna,* 136 S. Ct. 305 (2015), *Taylor v.*

---

[7] For present purposes, we "address only the qualified immunity question, not whether there was a Fourth Amendment violation in the first place." *Mullenix,* 136 S. Ct. at 308; *Pearson,* 555 U.S. at 236, 129 S. Ct. at 818 (constitutional violation or qualified immunity may be decided first).

*Barkes*, 135 S. Ct. 2042 (2015); *City and County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015); *Carroll v. Carman*, 574 U.S. 13, 135 S. Ct. 348 (2014); *Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012 (2014); *Wood v. Moss*, 572 U.S. 744, 134 S. Ct. 2056 (2014); *Stanton v. Sims*, 571 U.S. 3, 134 S. Ct. 3 (2013); *Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088 (2012); *Ryburn v. Huff*, 565 U.S. 469, 132 S. Ct. 987 (2012); *Messerschmidt v. Millender*, 565 U.S. 535, 132 S. Ct. 1235 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074 (2011)).  Unfortunately, the majority here has fallen into the trap of "letting the jury sort out the truth" despite the gravity of the situation these officers faced.

As explained above, it is undisputed that the two officers confronted and then shot at Cole as he emerged from dense bushes ten to twenty feet from Officer Hunter, unaware of their presence, and began to turn in their direction. This all happened within three to five seconds.  While he turned, Cole held a loaded 9mm semiautomatic pistol, finger on the trigger, pointed in the direction of his own head.  The officers knew he was mentally distraught, had ignored other police commands to disarm, had issued threats, and proceeded walking in the direction of nearby schools.

For immunity purposes, the question phrased one way is whether *any* reasonable officers could have believed that Cole's split-second turning toward them posed a life-threatening danger such that lethal force was necessary. Alternatively, what "clearly established law" held as of October 2010 that under all of the relevant circumstances, deadly force was not justified unless either a warning was given and the suspect allowed a chance to react, or the suspect actually turned his loaded pistol on the officer?  The answer here directly parallels the Supreme Court's reasoning in *Mullenix*, which the majority seriously shortchanged.

No. 14-10228 c/w No. 15-10045

In *Mullenix*, this court had denied qualified immunity to a trooper whose shot fatally wounded a suspect fleeing police in a high-speed chase. The Supreme Court's basic criticism of the panel decision was this: "In this case, the Fifth Circuit held that Mullenix violated the clearly established rule that a police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others. Yet this Court has previously considered—and rejected—almost that exact formulation of the qualified immunity question in the Fourth Amendment context." *Mullenix*, 136 S. Ct. at 308-09 (internal quotation marks and citation omitted).

The majority here posit as clearly established law, indeed an "obvious case," that a police officer may not use deadly force—without prior warning—against an armed, distraught suspect who, with finger in the pistol's trigger, posed "no threat" while turning toward an officer ten to twenty feet away. But in *Mullenix,* the Supreme Court reversed this court because "[t]he general principle that deadly force requires a sufficient threat hardly settles this matter." *Id*. at 309. Likewise, here, the majority's "no threat" and "obvious case" conclusions do not settle the matter of clearly established law.[8]

That the majority here purport to extract clearly established law from *Tennessee v. Garner* was rebuked in *Mullenix.* The Supreme Court corrected this court by summary reversal because the Court itself had summarily rejected applying the general standard of *Tennessee v. Garner* to deny qualified immunity. *Mullenix,* 136 S. Ct. at 309 (*citing Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S. Ct. 596, 599 (2004)). Instead, the "correct inquiry" was

---

[8] Worse, it treats as a disputed fact issue for immunity purposes what is clearly an issue of law. *See Wyatt v. Fletcher*, 718 F.3d 496, 502-03 (5th Cir. 2013).

whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the precise situation she confronted. *Id*. Including *Mullenix* and *Brosseau*, a series of Supreme Court cases has held that *Tennessee v. Garner* does not state "clearly established law" governing the use of deadly force other than in *Garner'*s precise factual context, the shooting of an unarmed burglary suspect fleeing away from an officer.[9] The confrontation in this case with an armed, ready-to-fire suspect is "obviously" different.

We fail to understand how the denial of qualified immunity to Officers Hunter and Cassidy can be rescued simply by intoning that this is an "obvious case" under *Garner*. *Garner* affirmed the constitutionality of deadly force against suspects when necessary to protect the life of officers or others "if, where feasible, some warning has been given." 471 U.S. at 11-12, 105 S. Ct. at 1701.[10] But *Garner* in no way renders "clearly established" a requirement to give a warning, and await the suspect's response, before shooting. Nor does it mandate that the suspect's weapon be trained on the officer or others. Like the rest of the calculus surrounding Fourth Amendment reasonableness, the "feasibility" of any such potentially deadly delay or factual nuance must be subjected to case-specific balancing with deference paid to the officer's reasonable perceptions in the midst of a tense situation. *Graham,* 490 U.S. at 396, 109 S. Ct. at 1872. Indeed, in describing its holding at the outset, *Garner* states only that "[deadly] force may not be used unless it is necessary to prevent the escape [of an apparently unarmed suspected felon] and the officer

---

[9] *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018); *White*, 137 S. Ct. at 552.

[10] Turning on distinctly different facts, *Garner* alone does not establish pertinent clearly established law here, and the majority does not contend as much.

has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."    471 U.S. at 3, 105 S. Ct. at 1697.[11]    No mention of a warning appears in this introduction, and "probable cause," not a fact-specific test, is the measure of the threat of harm.

Characterizing this case as a "no threat" or "obvious" Fourth Amendment violation is wrong for additional reasons.    Whether, under the material undisputed facts, Cole presented "no threat" to a reasonable police officer is the relevant issue to assess a Fourth Amendment violation.    But the immunity question, which the majority elides, is whether *every* reasonable officer in this factual context would have known he could not use deadly force.    *See Pearson,* 555 U.S. at 232, 129 S. Ct. at 815-816. The majority's analysis conflates these inquiries.    Second, the importance of grounding the inquiry in a specific factual context cannot be overstated.    In this case, if Officer Hunter had stood a hundred feet away from Cole, or Cole had not been turning toward the officers, or Cole had put the handgun in his pocket and wasn't touching it, the analysis of qualified immunity could be quite different.    Third, describing a situation as posing "no threat" is a conclusion, not an explanation or, as the majority seems to think, an exception to defining clearly established law in a specific context. No doubt there are rare "obvious" cases of Fourth Amendment violations

---

[11] The majority cites *Colston v. Barnhart*, 130 F.3d 96, 100 (5th Cir. 1997), for the necessity of giving a warning "where feasible" before the use of deadly force.  Oddly, *Colston* then immediately holds that the officer there "lying on his back with Colston nearby, had to immediately decide whether to shoot.  In light of the totality of the circumstances facing Barnhart, Barnhart's failure to give a warning was not objectively unreasonable." *Id.*  The feasibility of a warning is part of the overall Fourth Amendment analysis, not an independent sine qua non of official conduct.

committed by officers who are plainly incompetent or who knowingly violate the law. In the wide gap between acceptable and excessive uses of force, however, immunity serves its important purpose of encouraging officers to enforce the law, in "tense, uncertain and rapidly evolving" split-second situations, rather than stand down and jeopardize community safety.[12]

In their sole, erroneous dependence on *Garner,* the majority, "can cite no case from [the Supreme] Court denying qualified immunity because officers [entitled to apprehend Cole] selected one dangerous alternative over another." *Mullenix,* 136 S. Ct. at 310. The *Mullenix* Court showed that if anything, "clearly established law" was contrary to the plaintiff's position. The Court cited two prior Supreme Court car chase cases that resulted in immunity even though the fugitives—unlike the suspect in *Mullenix*—had not verbally threatened to kill any officers in their path. *Id.* at 310 (*citing Scott,* 550 U.S. at 384, 127 S. Ct. at 1778; *Plumhoff,* 572 U.S. at 777, 134 S. Ct at 2022). And in *Mullenix* itself, as here, the trooper had not warned the fugitive before shooting at his speeding car. These cases "reveal[ed] the hazy legal backdrop against which Mullenix acted," *Id.* at 309. Accordingly, the Court admonished, "[w]hatever can be said of the wisdom of Mullenix's choice, this Court's precedents do not place the conclusion that he acted unreasonably in these circumstances beyond debate." *Id.* at 311 (internal quotation marks omitted).

Not only do the majority cite "no case" in which the Supreme Court denied qualified immunity to an officer who used deadly force against a

---

[12] *Compare Wesby,* 138 S. Ct. at 590 ("Of course, there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. But a body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause.") (internal citation and quotation marks omitted).

mentally distraught individual in circumstances like the present case, but to the contrary, the Court required qualified immunity in two somewhat similar cases. In *Sheehan*, officers used deadly force to subdue a mentally ill woman during an armed confrontation. The Court restated that the Fourth Amendment is not violated even if police officers, with the benefit of hindsight, may have made some mistakes, because "[t]he Constitution is not blind to 'the fact that police officers are often forced to make split-second judgments.'" *Sheehan,* 135 S. Ct. at 1775 (quoting *Plumhoff,* 572 U.S. at 775, 134 S. Ct. at 2020).

Even closer to this case is *White v. Pauly*, where an officer arriving at the scene of an armed confrontation shot and killed a suspect without knowing whether his earlier-arrived colleagues had identified themselves as police. 137 S. Ct. at 550-51. In *White*, the Court chastised the lower court for "misunderst[anding]" the "clearly established" analysis by relying on the generalized pronouncements in *Graham* and *Garner*. *Id.* at 552. Whether Officer White should have second-guessed the preceding conduct of fellow officers hardly presented an "obvious case" pursuant to *Garner*. The Court speculated that perhaps, given the three-minute delay between when he arrived and when shots rang out, Officer White "should have realized that [a warning about police presence] was necessary before using deadly force." *Id*. There is a world of difference between three minutes and three seconds, which Officer Hunter had here, and between Officer White's securing himself behind a stone wall fifty feet from the suspect and Officer Hunter's standing fully exposed only ten to twenty feet away from Cole. The majority cannot reconcile the Supreme Court's insistence upon qualified immunity in *White* with their denial of the defense to Officers Hunter and Cassidy.

*Kisela v. Hughes,* cited in support of the majority, in no way articulates clearly established law concerning the necessity of a warning. First, the Court in *Kisela* overturned the Ninth Circuit's denial of qualified immunity without addressing the preliminary Fourth Amendment violation. 138 S. Ct. at 1152. A decision holding only that there was no "clearly established law" cannot itself have defined "clearly established law." The Court also criticized the Ninth Circuit for failing to implement correctly the rule that an officer has not "violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 1153 (internal quotation marks omitted). The Court catalogued all the relevant circumstances of the confrontation that provoked the shooting: a knife-armed, threatening suspect, whose bizarre behavior had been called in to 911, disobeyed officers' commands to disarm for up to one minute before they felt compelled to shoot. *Id.* The Court concluded, "[t]his is far from an obvious case in which any competent officer would have known that shooting Hughes to protect [the third party] would violate the Fourth Amendment." *Id.* Also "far from obvious" is the case before us, in which the officers had five seconds, not a whole minute, in which to decide whether to shoot at Cole.

Finally, the Supreme Court's decision in *Tolan v. Cotton* adds nothing to the substance of the qualified immunity discussion. In *Tolan,* the Court enumerated four critical, disputed evidentiary contentions relating to the officer's perception of danger to himself and thus to qualified immunity. 572 U.S. 650, 657-59, 134 S. Ct. 1861, 1866-67 (2014). Because this court had failed to credit the plaintiff's disputed version of these facts, the Court vacated summary judgment for the officer and remanded without deciding any merits

issue. *Id.* at 657, 134 S. Ct. at 1866. In contrast, this dissent credits only undisputed material facts and plaintiffs' version of disputable facts.

Like this court's panel in *Mullenix*, the majority here offer no controlling Supreme Court precedent, including *Garner,* to support that "clearly established law" mandated that the officers hold their fire until they had both warned Cole and given him a chance to drop his gun or until he pointed the loaded weapon directly at them.

For good measure, the *Mullenix* Court also considered the potential similarity of lower court decisions that dealt with qualified immunity. 136 S. Ct. at 311.  Fifth Circuit case law, the Court noted, did not "clearly dictate the conclusion that Mullenix was unjustified in perceiving grave danger and responding accordingly." *Id*. at 311 (*citing Lytle v. Bexar County*, 560 F.3d 404, 412 (5th Cir. 2009)).  But the Court quoted with approval an Eleventh Circuit case that granted immunity to a sheriff's deputy who fatally shot a mentally unstable individual "who was attempting to flee in the deputy's car, even though at the time of the shooting the individual had not yet operated the cruiser dangerously.  The court explained that 'the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect…'" *Id*. at 311 (*quoting Long v. Slaton*, 508 F.3d 576, 581-82 (11th Cir. 2007)).  Here, too, the thrust of *Mullenix* contradicts the majority's logic and holding.

Moreover, to the extent it is relevant[13], Fifth Circuit law does not support denying qualified immunity to Officers Hunter and Cassidy.  The district court

---

[13] *See* fn. 4, *supra*.

and, inferentially, the majority demand that qualified immunity be granted only if the suspect either disobeys immediate commands to disarm or points his weapon at the officers. The district court described such threatening actions as a *Manis* act.[14] It is true that in previous deadly force cases, this court approved qualified immunity for officers who reasonably believed that a non-compliant suspect was reaching toward where he could retrieve a weapon. *See Manis,* 585 F.3d at 842; *see also Reese v. Anderson,* 926 F.2d 494, 500-01 (5th Cir. 1991); *Young v. City of Killeen, Tx.,* 775 F.2d 1349, 1352 (5th Cir. 1985). The hitch in these particular cases is that there wasn't actually a weapon, yet the officer's objectively reasonable perception was determinative as a matter of law. In another such officer shooting case, this court upheld qualified immunity where the suspect, who was being interrogated for drunk driving at the side of a freeway, turned to walk away from the officer, then appeared to turn around toward him while reaching under his shirttail for what the officer thought could be a concealed weapon. *Salazar-Limon v. City of Houston,* 826 F.3d 272, 278 (5th Cir. 2016). This court added, "[f]urthermore, …in the context of this case, it is immaterial whether Salazar turned left, right, or at all before being shot. Specifically, we have never required officers to wait until a defendant turns toward them, with weapon in hand, before applying deadly force to ensure their safety." 826 F.3d at 279 n. 6.

While a "*Manis* act" can sustain qualified immunity even where no weapon is visible, it is not logical for an additional "act" to be mandated where the officers confront a suspect armed, ready to shoot his pistol, and turning toward them. An officer may be forced into shooting an unarmed suspect by a

---

[14] *Manis v. Lawson,* 585 F.3d 839 (5th Cir. 2009).

*Manis* act, and thus obtain qualified immunity.  But it is perverse and inconsistent with Fifth Circuit law to hold that the officer has no qualified immunity because she is constitutionally forbidden to shoot an armed suspect in close quarters without either looking down the barrel of the weapon or awaiting his response to her command.

In fact, that is exactly what this court has not held.  In *Ramirez v. Knoulton,* 542 F.3d 124, 127 (5th Cir. 2008), police shot a suspect they believed to be suicidal as he stood in profile to them, with a handgun in his right hand, and brought his hands together in front of his waist."  He "never raised his weapon nor aimed it at the officers." *Id.* at 129.  The court held that based on the officers' reasonable perception, no Fourth Amendment violation occurred, because the Constitution "does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Id. at 130.  See also Colston,* 130 F.3d at 100*; Ontiveros*, 564 F.3d at 385 (holding no constitutional violation where officer thought suspect was reaching into his boot for a weapon during confrontation in a mobile home).  As the Supreme Court put it in *Mullenix,* "the mere fact that courts have approved deadly force in more extreme circumstances says little, if anything, about whether such force was reasonable in the circumstances here."  136 S. Ct. at 312.

The majority describe only one Fifth Circuit police shooting case, out of dozens this court has decided, as an "obvious case." *Baker v. Putnal,* 75 F.3d 190 (5th Cir. 1996).  Whether that characterization applies to the claimed Fourth Amendment violation in *Baker,* to qualified immunity analysis, or simply to this court's decision to remand for trial is unclear in the majority opinion. *Baker,* however, says nothing about the merits of the case or about clearly established law, holding instead that "[t]here are simply too many factual issues to permit the Bakers' § 1983 claims to be disposed of on summary

judgment." *Baker,* 75 F.3d at 198. Hence, like *Kisela*, *Baker* cannot support any rule of clearly established law, much less explain what law is "obvious." Significantly, in *Baker,* whether the suspect was holding a gun visible to the officer was an important hotly contested issue, with eyewitnesses contradicting the officer's account of the incident. *Baker*, 75 F.3d at 198. Cole's case, in contrast, does not involve a "chaos on the beach" incident. The undisputed facts are starkly different here. It is undisputed, at a minimum, that Cole was holding a loaded weapon, his finger in the trigger, as he emerged from the woods; he was turning toward the officers; and they had five seconds to react. *Baker* does not show that the officers' conduct in *Cole* violated clearly established law.

To sum up, the majority opinion here repeats every error identified by the Supreme Court when it granted summary reversal in *Mullenix* and sent the instant case back for reconsideration. The majority's "clearly established" rule has changed, but not its errors. *Tennessee v. Garner* does not formulate "clearly established law" with the degree of specificity required by the Supreme Court's decisions on qualified immunity. The majority's "no threat" and "obvious case" statements pose the issues here at an excessive level of generality. The majority has no Supreme Court case law demonstrating that Officers Hunter and Cassidy were either plainly incompetent or had to know that shooting at Cole was unconstitutional under the circumstances before them and with the knowledge they possessed—he was mentally distraught; he was armed with his finger in the pistol's trigger; he was very close to Hunter; he had been walking in the direction of schools for which extra police protection had been ordered; and he had ignored other officers' commands to stop and drop his weapon. And they had three to five seconds to decide how dangerous he could be to them. The majority cites not one case from this court denying

44

qualified immunity under similar circumstances. *Mullenix* aptly summed it up for our purposes: "qualified immunity protects actions in the hazy border between excessive and acceptable force." 136 S. Ct. at 312 (internal quotation marks omitted). "[T]he constitutional rule applied by the Fifth Circuit was not 'beyond debate.'" *Id.*

It is not "clearly established" that police officers confronting armed, mentally disturbed suspects in close quarters must invariably stand down until they have issued a warning and awaited the suspects' reaction or are facing the barrel of a gun. "This was not a belief in possible harm, but a belief in certain harm. The fact that they would later discover this to be a mistaken belief does not alter the fact that it was objectively reasonable for them to believe in the certainty of that risk at that time." *Carnaby v. City of Houston,* 636 F.3d 183, 188 n.4 (5th Cir. 2011). That is the law in the Fifth Circuit, and the majority has pointed to no clearly established law otherwise. Shooting at Cole may not have been the wisest choice under these pressing circumstances, but the officers' decision, even if assailable, was at most negligent. Hunter and Cassidy were neither plainly incompetent nor themselves lawbreakers. While we are confident a jury will vindicate their actions, they deserved qualified immunity as a matter of law. We dissent.

No. 14-10228 c/w No. 15-10045

JERRY E. SMITH, Circuit Judge, dissenting:

This is a "red flag" case if ever there was one. The en banc majority commits grave error, as carefully explained in the dissents by Judge Jones, Judge Willett, Judges Ho and Oldham (jointly), and Judge Duncan. Yet eleven judges join the majority.

Abandon hope, all ye who enter Texas, Louisiana, or Mississippi as peace officers with only a few seconds to react to dangerous confrontations with threatening and well-armed potential killers. In light of today's ruling and the raw count of judges,[1] there is little chance that, any time soon, the Fifth Circuit will confer the qualified-immunity protection that heretofore-settled Supreme Court and Fifth Circuit caselaw requires.

Red flags abound. Judge Duncan cogently details the "rich vein of facts" describing this plaintiff's undisputed actions in the hours leading up to the shooting.[2]

- Red flag: a 9mm semi-automatic handgun and ammunition.
- Red flag: a double-barrel shotgun with shells.
- Red flag: a .44 magnum revolver.
- Red flag: a .38 revolver.
- Red flag: a suspect who had broken into a gun safe and stolen an unknown quantity of weapons and ammunition.
- Red flag: a police visit the night before to the suspect's house because of a disturbance with his parents.

---

[1] This en banc court consists of the sixteen active judges, plus two senior judges who were on the original panel. Of those sixteen active judges, nine join the majority opinion.

[2] I especially refer the reader to Part I of Judge Duncan's dissent, which sets forth the context and narrative of red-flag facts that easily justify qualified immunity. All three dissents persuasively explain the law of qualified immunity that the majority overlooks.

46

No. 14-10228 c/w No. 15-10045

• Red flag: a suspect with a dangerous knife at his parents' house.

• Red flag: a suspect who had a wild look in his eye and was smoking K2.

• Red flag: a suspect, distraught over breaking up with his girl-friend, moving toward the school where she was a student.

• Red flag: a suspect near an elementary school.

• Red flag: a suspect with personal issues including drug abuse.

• Red flag: a suspect seen running through the woods with at least three weapons.

• Red flag: a suspect irate and distraught.

• Red flag: a suspect who said he would shoot anyone who came near him.

• Red flag: a suspect armed with at least one handgun and pos-sibly three.

• Red flag: a suspect who had refused police demands to drop his weapon.

• Red flag: a suspect who deposited a cache of weapons and am-munition at a friend's house after arguing with his parents.

• Red flag: a suspect who yelled obscenities at an officer.

• Red flag: a suspect who had threatened to kill his girlfriend and himself.

• Red flag: a suspect whom the district court described as troubled.

• Red flag: a suspect described in his complaint as suffering from obsessive compulsive disorder, treated with medications from numerous medical professionals, and having poor judgment and impaired impulse control.

\* \* \* \* \*

Normally we expect police officers to recognize such red flags and to respond appropriately. Instead of protecting these officers from obvious dan-ger to themselves and the public, however, the en banc majority orders them

47

to stand down. What is the hapless officer to do in the face of today's decision? What indeed is the "clearly established law" that the majority now announces? The judges in the majority do not say.

The law of qualified immunity was poignantly summarized in 2019 by a dissenting judge who is now in the majority. Today's en banc ruling turns those words to dust.[3]

I respectfully dissent.

---

[3] *Winzer v. Kaufman Cty.*, 916 F.3d 464, 482 (5th Cir. 2019) (Clement, J., dissenting), *petition for rehearing en banc pending*:

> The implications of the majority's mistakes cannot be minimized. The majority decides that qualified immunity can be endangered by an affidavit filed at summary judgment that creates a fact issue nowhere else supported by record evidence.
>
> Worse still, it seriously undermines officers' ability to trust their judgment during those split seconds when they must decide whether to use lethal force. Qualified immunity is designed to respect that judgment, requiring us to second-guess only when it clearly violates the law. The standard acknowledges that we judges—mercifully—never face that split second. Indeed, we never have to decide anything without deliberation—let alone whether we must end one person's life to preserve our own or the lives of those around us.
>
> The qualified immunity standard stops this privilege from blinding our judgment, preventing us from pretending we can place ourselves in the officers' position based on a cold appellate record. It prevents us from hubristically declaring what an officer should have done—as if we can expect calm calculation in the midst of chaos.
>
> The majority opinion, written from the comfort of courthouse chambers, ignores that deference. Instead, it warns officers that they cannot trust what they see; they cannot trust what their fellow officers observe; they cannot trust themselves when posed with a credible threat. It instructs them, in that pivotal split second, to wait. But when a split second is all you have, waiting itself is a decision—one that may bring disastrous consequences.

No. 14-10228 c/w No. 15-10045

DON R. WILLETT, Circuit Judge, dissenting:

I repeat what I said last month: The entrenched, judge-invented qualified immunity regime ought not be immune from thoughtful reappraisal.[1]

Qualified immunity strikes an uneasy, cost–benefit balance between two competing deterrence concerns: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[2] By insulating incaution, the doctrine formalizes a rights–remedies gap through which untold constitutional violations slip unchecked. The real-world functioning of modern immunity practice—essentially "heads government wins, tails plaintiff loses"—leaves many victims violated but not vindicated. More to the point, the "clearly established law" prong, which is outcome-determinative in most cases, makes qualified immunity sometimes seem like unqualified impunity: "letting public officials duck consequences for bad behavior—no matter how palpably unreasonable—as long as they were the *first* to behave badly."[3]

That said, as a middle-management circuit judge, I take direction from the Supreme Court. And the Court's direction on qualified immunity is increasingly unsubtle. We must respect the Court's exacting instructions—even as it is proper, in my judgment, to respectfully voice unease with them.[4]

---

[1] *Zadeh v. Robinson*, 928 F.3d 457, 474 (5th Cir. 2019) (Willett, J., concurring in part, dissenting in part).

[2] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (flagging these "two important interests").

[3] *Zadeh*, 928 F.3d at 479.

[4] *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3 (1997) (overruling prior precedent whose unsoundness had been "aptly described" by the court of appeals).

No. 14-10228 c/w No. 15-10045

I

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[5] While this bar is not insurmountable, it is sky-high. And it is raised higher when courts leapfrog prong one (deciding whether the challenged behavior violates the Constitution) to reach simpler prong two: no factually analogous precedent. Merely proving unconstitutional misconduct isn't enough. A plaintiff must cite functionally identical authority that puts the unlawfulness "beyond debate" to "every" reasonable officer.[6] Last month, for example, the Eleventh Circuit, noting no "materially similar case" (thus no "clearly established law"), granted immunity to a police officer who fired at a family's dog but instead shot a 10-year-old child lying face-down 18 inches from the officer.[7] Not only that, the court "expressly [took] no position" as to "whether a constitutional violation occurred in the first place."[8] Translation: If the same officer tomorrow shoots the same child while aiming at the same dog, he'd receive the same immunity. *Ad infinitum*.

The Supreme Court demands precedential specificity. But it's all a bit recursive. There's no earlier similar case declaring a constitutional violation because no earlier plaintiff could find an earlier similar case declaring a constitutional violation. "Section 1983 meets Catch-22. Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because no one's answered

---

[5] *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[6] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam).

[7] *Corbitt v. Vickers*, 929 F.3d 1304, 1307–08 (11th Cir. 2019).

[8] *Id.* at 1323.

them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability. An Escherian Stairwell."[9]

## II

In recent years, individual Justices have raised concerns with the Court's immunity caselaw.[10] Even so, the doctrine enjoys resounding, even hardening favor at the Court. Just three months ago, in a case involving the warrantless strip search of a four-year-old preschooler, a strange-bedfellows array of scholars and advocacy groups—perhaps the most ideologically diverse amici ever assembled—implored the Court to push reset.[11] To no avail. This much is certain: Qualified immunity, whatever its success at achieving its intended policy goals, thwarts the righting of many constitutional wrongs.

Perhaps the growing left–right consensus urging reform will one day win out. There are several "mend it, don't end it" options. The Court could revisit *Pearson*[12] and nudge courts to address the threshold constitutional merits rather than leave the law undeveloped.[13] Even if a particular plaintiff cannot

---

[9] *Zadeh*, 928 F.3d at 479–80 (Willett, J., concurring in part, dissenting in part).

[10] Four sitting Justices "have authored or joined opinions expressing sympathy" with assorted critiques of qualified immunity. Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797, 1800 (2018) (including Justices Thomas, Ginsburg, Breyer, and Sotomayor, plus recently retired Justice Kennedy); *see, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (per curiam).

[11] *Doe v. Woodard*, 912 F.3d 1278 (10th Cir. 2019), *cert. denied*, No. 18-1173, 2019 WL 1116409, at *1 (May 20, 2019). As for congressional reform, Congress's refusal to revisit § 1983 suggests Article I acquiescence.

[12] 555 U.S. at 236.

[13] As observers have cautioned, unfettered *Pearson* discretion contributes to "constitutional stagnation" by impeding the development of precedent. Aaron L. Nielson & Christopher J. Walker, *The New Qualified Immunity*, 89 S. CAL. L. REV. 1, 23–24 (2015).

benefit (due to the "clearly established law" prong), this would provide moving-forward guidance as to what the law prescribes and proscribes. Short of that, the Court could require lower courts to explain *why* they are side-stepping the constitutional merits question.[14] Or the Court could confront the widespread inter-circuit confusion on what constitutes "clearly established law."[15] One concrete proposal: clarifying the degree of factual similarity required in cases involving split-second decisions versus cases involving less-exigent situations. The Court could also, short of undoing *Harlow* and reinstating the bad-faith prong, permit plaintiffs to overcome immunity by presenting *objective* evidence of an official's bad faith.[16] Not *subjective* evidence of bad faith, which *Harlow*, worried about "peculiarly disruptive" and "broad-ranging discovery," forbids.[17] And not unadorned *allegations* of bad faith. But objective evidence that the official actually realized that he was violating the Constitution.

Prudent refinements abound. But until then, as Judge Jones explains in today's principal dissent, the Supreme Court's unflinching, increasingly emphatic application of "clearly established law" compels dismissal.

## III

I remain convinced that contemporary immunity jurisprudence merits "a refined procedural approach that more smartly—and fairly—serves its

---

[14] *Id.* at 7.

[15] *See, e.g.*, RICHARD FALLON, JR., ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1047–50 (7th ed. 2015) (noting the difficulties of applying the clearly-established-law test); Karen M. Blum, *Section 1983 Litigation: The Maze, the Mud, and the Madness*, 23 WM. & MARY BILL RTS. J. 913, 925 n.68 (2015) ("[W]hether a right is found to be 'clearly established' is very much a function of which circuit (and I would add, which judge) is asking the question, and how that question is framed.").

[16] *Harlow v. Fitzgerald* prevents plaintiffs from relying on *subjective* evidence of bad faith. 457 U.S. 800, 815–16 (1982).

[17] *Id.* at 817.

intended objectives."[18] Yet I also remain convinced that a majority of the Supreme Court disagrees. My misgivings, I believe, are well advised. But we would be ill advised to treat the reform of immunity doctrine as something for this court rather than that Court.[19]

For these reasons, I respectfully dissent.

---

[18] *Zadeh*, 928 F.3d at 481 (Willett, J., concurring in part, dissenting in part).

[19] As for the sidelong critique of me in the dissenting opinion of Judges Ho and Oldham, it is, respectfully, a pyromaniac in a field of straw men. I have not raised originalist concerns with qualified immunity. My concerns, repeated today, are doctrinal, procedural, and pragmatic in nature. Nor has my unease with modern immunity practice led me to wage "war with the Supreme Court's qualified-immunity jurisprudence." I am a fellow dissenter today, notwithstanding my unease, precisely because I believe the Court's precedent compels it. In short, I have not urged that qualified immunity be repealed. I have urged that it be rethought. Justice Thomas—no "halfway originalist"—has done the same. *Ziglar*, 137 S. Ct. at 1872 (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence.").

JAMES C. HO and ANDREW S. OLDHAM, Circuit Judges, joined by JERRY E. SMITH, Circuit Judge, dissenting:

Apparently SUMREVs mean nothing.

In *Luna v. Mullenix*, 773 F.3d 712 (5th Cir. 2014), we sent a state trooper to a jury "in defiance" of "the concept and precedents of qualified immunity." 777 F.3d 221, 222 (5th Cir. 2014) (Jolly, J., dissenting from denial of rehearing en banc). The Supreme Court summarily reversed us. *Mullenix v. Luna*, 136 S. Ct. 305 (2015) (per curiam). Then they GVR'd us in *this* case and ordered us to reconsider our obvious error in light of *Mullenix*.

The en banc majority instead doubles down. That is wrong for all the reasons Judge Jones gives in her powerful dissent, which we join in full. We write to emphasize the en banc majority's unmistakable message: Four years after *Mullenix*, nothing has changed in our circuit.

I.

The Supreme Court has not hesitated to redress similar intransigence from our sister circuits—often through the "extraordinary remedy of a summary reversal." *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (quotation omitted). *See, e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019) (per curiam) (summarily reversing the Ninth Circuit); *Kisela*, 138 S. Ct. 1148 (per curiam) (same); *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) (reversing the D.C. Circuit); *White v. Pauly*, 137 S. Ct. 548 (2017) (per curiam) (summarily reversing the Tenth Circuit); *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015) (reversing the Ninth Circuit); *Carroll v. Carman*, 574 U.S. 13 (2014) (per curiam) (summarily reversing the Third Circuit); *Wood v. Moss*, 572 U.S. 744 (2014) (reversing the Ninth Circuit); *Plumhoff v. Rickard*, 572 U.S. 765 (2014) (reversing the Sixth Circuit); *Stanton v. Sims*, 571 U.S. 3 (2013) (per curiam) (summarily reversing the Ninth Circuit); *Reichle v. Howards*, 566 U.S. 658 (2012) (reversing the Tenth Circuit);

*Ryburn v. Huff*, 565 U.S. 469 (2012) (per curiam) (summarily reversing the Ninth Circuit); *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (same); *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam) (same).

In each of these cases, the Supreme Court reminded lower courts that qualified immunity requires us not only to identify a clearly established rule of law, but to do so with great specificity. Everyone agrees, of course, that Ryan Cole has a constitutional right not to be seized unreasonably. But "that is not enough" to subject a police officer to the burdens of our civil litigation system. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at [that] high level of generality." *al-Kidd*, 563 U.S. at 742. Rather, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (citation omitted).

Only by identifying a specific and clearly established rule of law do we ensure that the officer had "fair notice"—"in light of the specific context of the case, not as a broad general proposition"—that his or her *particular* conduct was unlawful. *Brosseau*, 543 U.S. at 198 (citation omitted). *See also, e.g.*, *Sheehan*, 135 S. Ct. at 1776 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."); *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (same); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (same).

So where is our clearly established law at issue here? Unbelievably, the en banc majority says we don't need any. That's so, they say, because "[t]his is an obvious case." *Ante*, at 16. That's obviously wrong for three reasons.

First, the Supreme Court to date has *never* identified an "obvious" case in the excessive force context. And the majority thinks this is the first? A case where a mentally disturbed teenager—who has a loaded gun in his hand with

his finger on the trigger; who has repeatedly refused to be disarmed; who has threatened to kill anyone who tries to disarm him; who poses such a deadly threat that police have been deployed to protect innocent students and teachers at his nearby high school—turns toward the officers just ten to twenty feet away, giving them only seconds to decide what to do in response. Really?

Second, the Supreme Court has granted qualified immunity in much tougher cases than this one. In *Plumhoff*, for example, officers fired 15 shots and killed two *unarmed* men who fled a traffic stop. In *Brosseau*, an officer shot an *unarmed* man who refused to open his truck window. In *Kisela*, officers shot a woman who was hacking a tree with a kitchen knife. In *Sheehan*, officers shot an old woman holding a kitchen knife in an assisted-living facility. In all of these cases, the Court held the officers were entitled to qualified immunity.

Third, this is *Mullenix* all over again. There our court relied on clearly established law as articulated in *Tennessee v. Garner*, 471 U.S. 1 (1985). *Garner* involved an unarmed man who fled from police after stealing $10. An officer fatally shot Garner in the back of the head as he attempted to climb a fence. Our court then extended *Garner* to Mullenix's case—which involved a man who led police on a high-speed car chase after violating his probation. A state trooper attempted to end the chase by shooting the speeding car's engine block—but he missed the engine, hit the driver in the face, and killed him. *See Luna*, 773 F.3d at 719–20 (discussing *Garner*). The Supreme Court summarily reversed us because—as should be painfully obvious from the Court's serial reversals in this area—that's not how qualified immunity works. *See Mullenix*, 136 S. Ct. at 308–09 (holding our court erred in our extrapolation of *Garner* to

new facts). And they GVR'd us *in this very case* to fix our mistakes in light of *Mullenix*. The Supreme Court's message could not be clearer.[1]

Still, somehow, today's majority does not get it. Here, as in *Mullenix*, the majority attempts to rely on *Garner* to establish the governing rule of law. From *Garner*, the majority somehow divines a rule that an officer cannot shoot a mentally disturbed teenager holding a gun near his school. This is demonstrably erroneous. In fact, one thing that unites the Supreme Court's recent reversals in cases involving qualified immunity and excessive force is the attempt by lower courts to extrapolate *Garner* to new facts. *See Mullenix*, 136 S. Ct. at 308–09; *Scott v. Harris*, 550 U.S. 372, 381–82 (2007) (same); *Allen v. City of West Memphis*, 509 F. App'x 388, 392 (6th Cir. 2012) (extrapolating *Garner*), *rev'd by Plumhoff, supra*.

Moreover, there are additional parallels between *Mullenix* and this case. Consider the supposed requirement that an officer take some sort of non-lethal measure before using lethal force. In *Mullenix*, our court used the power of 20-20 hindsight to say that a reasonable officer should have used spike strips to

---

[1] The Supreme Court issues GVRs when, as here, legal error infects the judgment below. *See, e.g.*, *Hicks v. United States*, 137 S. Ct. 2000, 2000–01 (2017) (Gorsuch, J., concurring) (defending GVR because "[a] plain legal error infects this judgment" and because petitioner "enjoys a reasonable probability of success" in getting judgment reversed on the merits); *id.* at 2002 (Roberts, C.J., dissenting) ("[W]ithout a determination from this Court that the judgment below was wrong or at least a concession from the Government to that effect, we should not, in my view, vacate the Fifth Circuit's judgment."). As the cert petition explained, our panel denied qualified immunity "based on the same rationale" on "which this Court reversed in *Mullenix*." Pet. at i, 2016 WL 4987324. We think it obvious the Supreme Court GVR'd because it agreed. And tellingly, the majority does not offer an alternative theory to explain the GVR. We ignore the Court's message at our peril. *See, e.g.*, *Smith v. Mitchell*, 437 F.3d 884 (9th Cir. 2006) (granting habeas relief to a state prisoner because the evidence was insufficient to prove she shook her grandbaby to death); *Patrick v. Smith*, 550 U.S. 915 (2007) (GVR'ing i/l/o *Carey v. Musladin*, 549 U.S. 70 (2006)); *Smith v. Patrick*, 519 F.3d 900 (9th Cir. 2008) (again granting habeas relief); *Patrick v. Smith*, 558 U.S. 1143 (2010) (GVR'ing i/l/o *McDaniel v. Brown*, 558 U.S. 120 (2010)); *Smith v. Mitchell*, 624 F.3d 1235 (9th Cir. 2010) (again granting habeas relief); *Cavazos v. Smith*, 565 U.S. 1 (2011) (SUMREV'ing).

57

stop the chase. *See* 773 F.3d at 720–21. The Supreme Court emphatically rebuked us. *See* 136 S. Ct. at 310. They told us that an officer does not have to expose himself or other officers to harm when the suspect has already refused to be disarmed. That meant Trooper Mullenix did not have to wait to see if the fleeing felon would shoot or run over the officer manning the spike strips. *See id.* at 310–11.

So too here. In this case, the majority complains that the officers did not provide sufficient warning. But there was no clearly established law requiring Officers Cassidy and Hunter to announce themselves—while caught in an open and defenseless position—and hope not to get shot. That is particularly true here because officers previously ordered Cole to put down his gun, he refused, and he threatened to kill anyone who attempted to disarm him.

And in *Mullenix*, as here, we accused the police officers of being cowboys. Earlier on the day of the shooting, Trooper Mullenix received a negative performance review for "not being proactive enough as a Trooper"; so in the aftermath of the shooting, Mullenix said to his supervisor, "How's that for proactive?" 773 F.3d at 717; *see also* 136 S. Ct. at 316 (Sotomayor, J., dissenting). The panel opinions and en banc majority opinion in this case likewise seethe with innuendo that Officers Hunter and Cassidy were wannabe cowboys looking for a gunfight. We are in no position to make such accusations. No member of this court has stared down a fleeing felon on the interstate or confronted a mentally disturbed teenager who is brandishing a loaded gun near his school. And the *Mullenix* Court held that the qualified-immunity standard gives us no basis for sneering at cops on the beat from the safety of our chambers. *See* 136 S. Ct. at 310–11 (majority op.) (citing Brief for National Association of Police Organizations et al. as *Amici Curiae*). Yet here we are. Again.

## II.

The majority cannot dodge responsibility for today's decision by pointing to the limits of appellate jurisdiction. *See ante*, at 13–14 (majority op.); *ante*, at 1 (Elrod, J., concurring). We obviously lack interlocutory appellate jurisdiction to review the *genuineness* of an officer's fact dispute. *See, e.g.*, *Johnson v. Jones*, 515 U.S. 304, 313–14 (1995); *Kinney v. Weaver*, 367 F.3d 337, 346–47 (5th Cir. 2004) (en banc) (applying *Johnson v. Jones*).

But that does nothing to defeat jurisdiction where, as here, the factual disputes are *immaterial*. That is why the Supreme Court repeatedly has rejected such no-jurisdiction pleas from those who wish to deny qualified immunity. *See, e.g.*, *Plumhoff*, 572 U.S. at 771–73; *id.* at 773 (noting existence of genuine fact dispute did not defeat appellate jurisdiction in *Scott v. Harris*).

All the fact disputes in the world do nothing to insulate this *legal* question: Is this an "obvious case" under *Garner*—notwithstanding a mountain of SUMREVs, GVRs, and pointed admonitions from the Supreme Court? The majority says yes. *Ante*, at 16. They obviously must have jurisdiction to say so. With respect, it makes no sense to say we lack jurisdiction to disagree with them.

## III.

What explains our circuit's war with the Supreme Court's qualified-immunity jurisprudence? Two themes appear to be at play.

First, the majority suggests we should be less than enthused about Supreme Court precedent in this area, because it conflicts with plaintiffs' jury rights. To quote the panel: "Qualified immunity is a judicially created doctrine calculated to protect an officer from trial before a jury of his or her peers. At bottom lies a perception that the jury brings a risk and cost that law-enforcement officers should not face, that judges are preferred for the task—a

judgment made by appellate judges." *Cole v. Carson*, 905 F.3d 334, 336 (5th Cir. 2018). Or in the words of today's majority: "The Supreme Court over several years has developed protection from civil liability for persons going about their tasks as government workers" (a rather curious way to describe the men and women who swear an oath to protect our lives and communities). *Ante*, at 2. But "the worker's defense" must yield, in cases like this, "in obeisance to [the] constitutional mandate" of a jury trial. *Id.*

We appreciate the majority's candor. But inferior court judges may not prefer juries to the Justices.

Second, some have criticized the doctrine of qualified immunity as ahistorical and contrary to the Founders' Constitution. *Ante* at 2 (suggesting denial of qualified immunity is commanded by "the Founders"); *compare* William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45, 49–61 (2018), *with* Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 NOTRE DAME L. REV. 1853, 1856–63 (2018); *see also Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring dubitante), *revised on petition for reh'g en banc*, 928 F.3d 457, 473 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part).

As originalists, we welcome the discussion. But separate and apart from the fact that we are bound as a lower court to follow Supreme Court precedent, a principled commitment to originalism provides no basis for subjecting these officers to trial.

The originalist debate over qualified immunity may seem fashionable to some today. But it is in fact an old debate. Over two decades ago, Justices Scalia and Thomas noted originalist concerns with qualified immunity. But they also explained how a principled originalist would re-evaluate established

doctrines. *See Crawford-El v. Britton*, 523 U.S. 574, 611–12 (1998) (Scalia, J., joined by Thomas, J., dissenting).

A principled originalist would not cherry pick which rules to revisit based on popular whim. A principled originalist would fairly review decisions that favor plaintiffs as well as police officers. As Justice Scalia explained in a dissent joined by Justice Thomas, a principled originalist would evenhandedly examine disputed precedents that *expand*, as well as limit, § 1983 liability:

> [O]ur treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted . . . . [But] [t]he § 1983 that the Court created in 1961 bears scant resemblance to what Congress enacted almost a century earlier. I refer, of course, to the holding of *Monroe v. Pape*, 365 U.S. 167 (1961), which converted an 1871 statute covering constitutional violations committed "*under color of* any statute, ordinance, regulation, custom, or usage of any State," Rev. Stat. § 1979, 42 U.S.C. § 1983 (emphasis added), into a statute covering constitutional violations committed *without* the authority of any statute, ordinance, regulation, custom, or usage of any State, and indeed even constitutional violations committed in stark violation of state civil or criminal law.

*Id.* at 611.

Justices Scalia and Thomas ultimately concluded that it is better to leave things alone than to reconfigure established law in a one-sided manner. If we're not willing to re-evaluate all § 1983 precedents in a balanced and principled way, then it "is perhaps just as well" that "[w]e find ourselves engaged . . . in the essentially legislative activity of crafting a sensible scheme of qualified immunities for the statute we have invented—rather than applying the common law embodied in the statute that Congress wrote." *Id.* at 611–12.

Translation: If we're not going to do it right, then perhaps we shouldn't do it at all.

No. 14-10228 c/w No. 15-10045

Subjecting these officers to trial on originalist grounds is precisely the unprincipled practice of originalism that Justices Scalia and Thomas railed against. And not just for the procedural reasons they identified in *Crawford-El*. What about the original understanding of the Fourth Amendment, which the plaintiffs here invoke as their purported substantive theory of liability in this case? Does the majority seriously believe that it is an "unreasonable seizure," *as those words were originally understood at the Founding*, for a police officer to stop an armed and mentally unstable teenager from shooting innocent officers, students, and teachers?

And make no mistake: Principled originalism is not just a matter of intellectual precision and purity. There are profound practical consequences here as well, given the important and delicate balance that qualified immunity is supposed to strike. As the Supreme Court has explained, qualified immunity ensures that liability reaches only "the plainly incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308 (quotation omitted). And absent plain incompetence or intentional violations, qualified immunity must attach, because the "social costs" of any other rule are too high:

> [I]t cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties.

*Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (alterations and quotations omitted); *see also, e.g., Sheehan*, 135 S. Ct. at 1774 n.3 (noting "the importance of qualified immunity to society as a whole").

62

No. 14-10228 c/w No. 15-10045

For those who have expressed concerns about a "one-sided approach to qualified immunity," *Kisela*, 138 S. Ct. at 1162 (Sotomayor, J., dissenting); *see also Zadeh*, 902 F.3d at 499 & n.10 (Willett, J., concurring dubitante) (quoting *Kisela*, 138 S. Ct. at 1162 (Sotomayor, J., dissenting)); 928 F.3d at 480 & n.61 (Willett, J., concurring in part and dissenting in part) (same), look no further than the majority opinion. The majority undoes the careful balance of interests embodied in our doctrine of qualified immunity, stripping the officers' defenses without regard to the attendant social costs.[2]

Now *that* is a one-sided approach to qualified immunity as a practical matter. And as Justices Scalia and Thomas have observed, it's also a one-sided approach to qualified immunity as an originalist matter:  It abandons the defense without also reconsidering the source and scope of officers' liability in the first place. *See Crawford-El*, 523 U.S. at 611–12 (Scalia, J., joined by Thomas, J., dissenting). To quote Justice Alito:  "We will not engage in this halfway originalism." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2470 (2018). *See also id.* (criticizing litigants for "apply[ing] the Constitution's supposed original meaning only when it suits them"); *Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Alito, J.,

---

[2] Those social costs are particularly stark today given widespread news of low officer morale and shortages in officer recruitment. *See, e.g.*, Ashley Southall, *When Officers Are Being Doused, Has Police Restraint Gone Too Far?*, N.Y. TIMES, July 25, 2019, at A22; Martin Kaste & Lori Mack, *Shortage of Officers Fuels Police Recruiting Crisis*, NPR (Dec. 11, 2018, 5:05 AM), https://n.pr/2Qrbrnq; Jeremy Gorner, *Morale, Policing Suffering in Hostile Climate, Cops Say; 'It's Almost Like We're the Bad Guys,' Veteran City Officer Says*, CHI. TRIB., Nov. 27, 2016, at 1.

concurring in the judgment) ("[I]t would be freakish to single out the provision at issue here for special treatment.").[3]

* * *

Our circuit, like too many others, has been summarily reversed for ignoring the Supreme Court's repeated admonitions regarding qualified immunity. There's no excuse for ignoring the Supreme Court again today. And certainly none based on a principled commitment to originalism.

Originalism for plaintiffs, but not for police officers, is not principled judging. Originalism for me, but not for thee, is not originalism at all. We respectfully dissent.

---

[3] In a footnote, Judge Willett notes that his criticism of the Supreme Court's qualified immunity precedents is not based on originalist grounds. *Ante*, at 4 n.19. To our minds, that makes his criticism harder, not easier, to defend. If his concerns are based on practical and not originalist considerations, then he should address them to the Legislature, rather than attack the Supreme Court as "one-sided." *Zadeh*, 902 F.3d at 499 & n.10 (Willett, J., concurring dubitante) (quoting *Kisela*, 138 S. Ct. at 1162 (Sotomayor, J., dissenting)). He also invokes Justice Thomas's opinion in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017). But that opinion cites Justice Scalia's opinion in *Crawford-El*, which (as we explained above) warns qualified immunity skeptics not to engage in halfway originalism.

No. 14-10228 c/w No. 15-10045

STUART KYLE DUNCAN, Circuit Judge, joined by SMITH, OWEN, HO, and OLDHAM, Circuit Judges, dissenting:

The majority opinion overlooks or omits undisputed material facts showing that any reasonable officer would have viewed Ryan Cole as a severe threat. Before the shooting, the defendant officers: (1) were tracking a distraught suspect wandering through the woods armed with a loaded 9mm semi-automatic handgun; (2) who had earlier that morning off-loaded a cache of weapons and ammunition at a friend's house; (3) who had already refused to give up his pistol when confronted by the police; and (4) who had threatened to "shoot anyone who came near him." Cole did not dispute those facts and, indeed, convinced the district court they were irrelevant. Joining Judge Jones' dissent in full, I respectfully dissent on the additional grounds provided by these pre-encounter facts.

No one doubts some of the events on October 25, 2010—when the officers violently encountered Cole in the woods near Garland, Texas—are disputed. The question is whether those disputes are *material. See, e.g., Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 483 (5th Cir. 2001) ("threshold issue" on qualified immunity appeal "is whether the facts the district judge concluded are *genuinely disputed* are also *material*"). Judge Jones' dissent compellingly shows they are not: Resolving all disputes in Cole's favor, the undisputed facts still show the officers violated no clearly established law. Jones Dissent at 2–3, 11–22. The majority thus errs by concluding that "competing factual narratives" bar it from deciding qualified immunity. Maj. at 3.

I write separately to emphasize what led up to the shooting, and also to explain why those undisputed events provide further reasons to reverse. The majority and Judge Jones focus on the shooting itself, as did the district court. But the prelude to the shooting gives unavoidable context for evaluating the

65

officers' actions.[1] Surprisingly, the district court did not even analyze those stage-setting facts, which it mistakenly deemed irrelevant. *See Cole v. Hunter,* No. 3:13-CV-02719-O, 2014 WL 266501, at \*13 n.5 (N.D. Tex. Jan. 24, 2014); *Cole v. Hunter*, 68 F. Supp. 3d 628, 642–43 (N.D. Tex. 2014). So, to assess their impact, we must "undertake a cumbersome review of the record." *Johnson v. Jones*, 515 U.S. 304, 319 (1995). That extra work is sometimes imperative, as here, "to ensure that the defendant's right to an immediate appeal on the issue of materiality is not defeated solely on account of the district court's failure to articulate its reasons for denying summary judgment." *Colston v. Barnhart*, 146 F.3d 282, 285 (5th Cir. 1998), *denying reh'g in* 130 F.3d 96 (5th Cir. 1997).

This detailed record review (*see* Part I) compels two conclusions (*see* Part II). First, the district court erred by excluding the undisputed events before the shooting. That error—based on a misreading of our precedent—truncated the qualified immunity analysis. That alone requires reversing the summary judgment denial. Second, in light of those pre-encounter facts, the majority's insistence that this is an "obvious case" collapses. Maj. at 16. Given what confronted the officers, the majority cannot say what they did was "obviously" unlawful. The only thing obvious is that no case told the officers, clearly or otherwise, how to respond when they met Cole that morning, emerging from the woods with his finger on the trigger of a loaded gun.

By denying qualified immunity and making the officers run the gauntlet of trial, the majority sets a precedent that "seriously undermines officers' ability to trust their judgment during those split seconds when they must

---

[1] *See, e.g., Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015) (courts "must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer"); *Tennessee v. Garner*, 471 U.S. 1, 9 (1985) (whether a "particular" seizure was justified depends on "the totality of the circumstances").

decide whether to use lethal force." *Winzer v. Kaufman Cty.*, 916 F.3d 464, 482 (5th Cir. 2019) (Clement, J., dissenting).

## I.

The majority begins "around 10:30 a.m.," less than an hour before the shooting. Maj. at 4. But events began to unfold much earlier.[2] Around 2 a.m. that morning, Cole knocked on the door of his friend, Eric Reed Jr., to show him "a 44 magnum revolver." Awakened by the knocking, Eric Jr.'s father (Eric Sr.) left his room, saw Cole with the gun, and told him to leave. Eric Jr. convinced Cole to leave the revolver because "he [did not] need to be carrying a weapon around."

Around 8 a.m., Eric Jr. gave his father Cole's gun. Eric Sr., a retired Sachse police officer, then notified Officer Vernon Doggett, who came to the Reeds'. Eric Jr. told his father and Doggett that "[Cole] told him there were more guns on the side of the house." There, they found "a double barrel shot gun with some shot gun shells and what appeared to be a plastic bag with 9mm bullets," which Doggett secured. Eric Jr. also explained Cole "had broken up with his girlfriend and was going to kill himself and his girlfriend."

Doggett was a resource officer for Sachse High School, where Cole and his girlfriend attended. He contacted Sergeant Garry Jordan, told him about the guns, and asked to meet at the school. Doggett reported that Cole "may be at school with a 9mm handgun." Another officer checked whether Cole was in class, and Jordan searched the parking areas for Cole.

---

[2] All of these facts come from reports and transcriptions of radio transmissions made within a day or two of the incident. None come from affidavits submitted by the officers years later. And, as explained below, none of these pre-encounter facts was disputed by Cole or analyzed by the district court.

Not finding him, Jordan went to Coles' and spoke to his parents. He learned that, the previous evening, officers had responded to a disturbance there. Officers had found Cole's father "holding Ryan down" because "he did not want [Cole] to leave the residence with the pocket knife that he had." He said "his son had a wild look in his eye and . . . had been smoking K2." While the officers found there had been no assault, all agreed it was "a good idea for Cole to stay the night with a friend." The Coles had not seen Ryan since then but reported he had "apparently returned home during the night and had opened the gun safe, removed an unknown amount [*sic*] of weapons, and reset the combination."

Meanwhile, Eric Jr. noticed Cole was back. He asked Cole if he was armed and Cole showed him a "38 revolver" and a "9mm semiauto." He convinced Cole to give him the revolver, but Cole told him he was not "getting the 9mm." Cole also said that the 9mm was loaded and that he did not "wanna use it on [Eric Jr.]" Cole stated that "he would shoot anyone who came near him." Cole left, and Eric Jr. called his father, who called the police.

Around 10:49 a.m., Officer Stephen Norris radioed "all available Sachse officers" to respond to the area of the Reed residence. He reported Cole was "observed running south of the location with 3 weapons, one a loaded 9mm." He also reported Cole was "irate and distraught and stated he would shoot anyone who came near him." Around the same time, Sachse Officer Michael Hunter was dispatched to assist Jordan at the Coles', but on arrival he was told by Sachse Officer Carl Carson he was not needed. As Hunter was leaving, he heard Norris' call advising Cole was "in the area . . . with a gun." Hunter

stated he "did not know the specifics of the call at this point," but proceeded to the Reeds' residence. In response to Norris' call, Jordan also left the Coles'.

Sachse Officer Martin Cassidy also received Norris' dispatch and went to the area Norris indicated. He was given Cole's description and advised that Cole was "armed with at least one handgun and possibly three." Cassidy spoke with Norris on the phone about "the proximity of Armstrong Elementary School to the location where [Cole] was last seen." Cassidy therefore went to check on the school and a nearby shopping center for any signs of Cole.

Meanwhile, Hunter arrived at the Reeds', where he met Jordan and Carson. Hunter overheard Eric Jr. say he had gotten "one gun" from Cole but that Cole had left "armed with a 9mm handgun." "Hunter put [Cole's] description out to other officers," and then he and Carson went to search for Cole. After speaking with the officers, Eric Jr. checked for more guns and found "6 firearms around [his] house."

Jordan then observed Officers Elliott and Sneed pass by in a patrol unit. Those officers found Cole nearby. Elliott reported that "Sneed . . . advised [Cole] to show his hands." Instead, Cole "reached into his waist band and pulled a pistol and placed it to his head after about three steps and refused to obey Lt. Sneed['s] commands." When Jordan arrived, Sneed "drew his duty weapon and yelled at [Cole] to drop the weapon," but Cole refused. As Cole continued eastbound towards Highway 78, Sneed "warned [Cole] that [he] would shoot him in the back if he tried to get to the highway or walk toward any innocent bystanders." Cole "would occasionally turn his head and yell obscenities at [Sneed]." Two other officers then parked "directly in front of [Cole's] path." To avoid them, Cole turned "northbound and began walking the railroad tracks." Jordan was constantly updating dispatch about Cole's movements. "Suddenly, [Sneed] observed [Cole] cut eastbound and run up a hill and into the brush

towards Highway 78." Dispatch reported that Cole was "off tracks coming through tree lines towards [Highway] 78."

Hunter, Carson, and Cassidy were monitoring Cole's movements from the dispatches. They arrived separately at the part of Highway 78 where Cole was thought to be. Hunter noted "[Cole] appeared to be walking towards the railroad track," and he advised Carson "[they] needed to go out to the highway and intercept [him]." Cassidy advised Carson to get out his taser and follow Cassidy. Hunter "parked further south on Highway 78 as [he] figured [Cole] would be on the railroad track paralleling Highway 78 at about [his] location." He guessed correctly. As Hunter "began to look for cover since [he] was out in the open," Cole "walked out from the brush approximately 10 to 20 feet from [Hunter]."

What followed was the shooting.

## II.

Cole did not dispute these stage-setting events in opposing summary judgment. To the contrary, he argued any "prior events" before the shooting were "irrelevant." The district court agreed, excluding from its qualified immunity analysis the "events" from "earlier that morning," *Cole*, 2014 WL 266501, at *13 n.5, and focusing solely on what happened "immediately before and during the shooting." *Cole*, 68 F. Supp. 3d at 644. That mistake skewed the district court's analysis and provides yet another reason why we should reverse.

First, the district court erred by excluding everything that happened before the officers' five-second encounter with Cole. That approach artificially truncates the qualified immunity analysis. In assessing qualified immunity, we "[c]onsider[ ] the specific situation confronting [officers]," *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1778 (2015), which "must be judged from

the perspective of a reasonable officer on the scene[.]" *Graham v. Connor*, 490 U.S. 386, 396 (1989). A "reasonable officer" does not shape his decisions based only on the seconds when he confronts an armed suspect; instead, he acts based on *all* relevant circumstances, including the events leading up to the ultimate encounter. *See, e.g., Escobar v. Montee*, 895 F.3d 387 (5th Cir. 2018) (courts evaluate excessive force claims "from the perspective of a reasonable officer on the scene, paying 'careful attention to the facts and circumstances of each particular case'") (quoting *Graham*, 490 U.S. at 396). That is precisely how the Supreme Court has instructed lower courts to assess whether force is excessive: The seminal case, *Tennessee v. Garner*, asks whether a seizure was justified, based not only on the immediate seizure, but on "the totality of the circumstances" facing the officers. 471 U.S. 1, 9 (1985). And qualified immunity cases, both from the Supreme Court and our court, routinely consider the background facts that shaped an officer's confrontation with a suspect in order to evaluate the officer's ultimate use of force.[3]

The district court's sole contrary authority was our statement in *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011), that the excessive force inquiry "is confined to whether the [officer or another person] was in danger *at the moment of the threat.*" But the district court overread *Rockwell*. We made that statement in *Rockwell* to reject the notion that officers' negligence *before*

---

[3] *See, e.g., Mullenix v. Luna*, 136 S. Ct. 305, 306 (2015) (assessing officer's shooting of suspect during car chase beginning with events preceding the "18-minute chase"); *Plumhoff v. Rickard*, 572 U.S. 765, 768–70 (2014) (assessing officer's shooting of suspects in Memphis, Tennessee after lengthy car chase beginning with traffic stop in "West Memphis, Arkansas"); *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004) (evaluating officer's shooting of fleeing suspect beginning with events "[o]n the day before the fracas"); *Colston*, 130 F.3d at 100 (determining officer's failure to warn was not objectively unreasonable "[i]n light of the totality of the circumstances facing [the officer]") (citing *Garner*, 471 U.S. at 10).

a confrontation determines whether they properly used deadly force *during* the confrontation. *See id.* at 992–93 (rejecting argument that "circumstances surrounding a forced entry" bear on "the reasonableness of the officers' use of deadly force"). The cases *Rockwell* cited say that plainly. *See, e.g., Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992) ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.").[4] And the key case *Rockwell* quoted for the "moment-of-the-threat" point recognized that pre-confrontation events could "set the stage for what followed in the field." *Bazan*, 246 F.3d at 493.

By misreading our cases, the district court blinded itself to a rich vein of facts—facts Cole did not dispute below—that round out the picture of the officers' violent encounter with Cole. At a minimum, that error alone requires reversing the denial of summary judgment and remanding for reconsideration of the officers' actions in light of *all* relevant undisputed facts. *See, e.g., White v. Balderama*, 153 F.3d 237, 242 (5th Cir. 1998) (concluding "limited remand" was appropriate given "lack of specificity in . . . district court's order denying summary judgment on the basis of qualified immunity").

Second, the undisputed pre-encounter events underscore why, contrary to the majority's view, this is far from an "obvious case." Maj. at 16. An "obvious case," the Supreme Court has explained, is one where an officer's actions are

---

[4] Our cases continue to apply the *Rockwell* "moment-of-the-threat" principle in this way. *See, e.g., Shepherd v. City of Shreveport*, 920 F.3d 278 (5th Cir. 2019) (explaining that, because the excessive force inquiry is "confined to whether the officer was in danger at the moment of the threat[,] . . . [t]herefore, any of the officers' actions leading up to the shooting are not relevant") (emphasis added) (internal quotes and citation omitted); *Harris v. Serpas*, 745 F.3d 767, 772–73 (5th Cir. 2014) (same) (discussing *Rockwell*).

plainly unlawful under a generalized legal test, even if those actions do not contravene a "body of relevant case law." *Brosseau*, 543 U.S. at 199 (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)); *see also, e.g., White v. Pauly*, 137 S. Ct. 548, 552 (2017) (an "obvious case" means that "in the light of pre-existing law the unlawfulness [of the officer's actions] must be apparent") (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (cleaned up). As I understand the majority opinion, it believes this is an obvious case because a jury could find that (1) Cole "posed no threat" to the officers; (2) the officers fired "without warning"; and (3) the officers had "time and opportunity" to warn Cole, but did not. Maj. at 15. According to the majority, this scenario would plainly violate *Garner*'s generalized test that an officer may not use deadly force to apprehend a suspect who "poses no immediate threat to the officer," unless he warns the suspect "where feasible." *Id.* (quoting *Garner*, 471 U.S. at 11–12).

Judge Jones' dissent shows that, even resolving all disputed facts in Cole's favor, the officers did not "obviously" violate *Garner*'s generalized test during the immediate shooting—that is, when in the space of five seconds at most, the officers met Cole at a distance of 10–20 feet as he backed out of the woods, still armed, and began to turn. Jones Dissent at 11–12. But if we include the undisputed facts leading up to the shooting, the notion that this is an "obvious case" crumbles. To believe that, we would have to blind ourselves to the facts that (1) the officers were searching for an irate, distraught suspect; (2) who was wandering through the woods armed with a loaded semi-automatic handgun; (3) who had refused police demands to turn over his weapon; (4) who had just that morning deposited a cache of weapons and ammunition at his friend's house; and (5) who had threatened to "shoot anyone who came near him." Those were the "totality of the circumstances" facing the officers, *Colston*, 130 F.3d at 100, and they were not disputed by Cole or the district court. Given

those circumstances, the officers might have taken any number of actions when they met Cole in the woods that morning—they might have warned him, or shot him, or shot in the air, or retreated, or remained frozen in place to see what he would do. But to say it is "obvious" what they should have done is to denude the concept of an "obvious case" of any meaning.

Once stripped of the conceit that this is an "obvious case," the majority has nothing left to justify its holding. The Supreme Court has bluntly told us that, outside the "obvious case" scenario, "*Garner* . . . do[es] not by [itself] create clearly established law[.]" *White v. Pauly*, 137 S. Ct. at 552. And, of course, the majority does not try to claim that the facts of *Garner* are anything like this case. In *Garner*, a police officer shot a fleeing, unarmed burglar in the back of the head. The officer admitted he did not even suspect the burglar was armed. *See* 471 U.S. at 3 (noting the officer "saw no sign of a weapon" at the time he shot and, afterwards, admitted "[he] was 'reasonably sure' and 'figured' that [the suspect] was unarmed"). Apples and oranges does not capture the chasm between that case and this one.

The majority does claim that our 1996 decision in *Baker v. Putnal*, "clearly established" that the officers' conduct here was unlawful. Maj. at 16 (citing 75 F.3d 190, 193 (5th Cir. 1996)). That is mistaken. In *Baker*, Officer Putnal was patrolling a crowded beach area when gunfire erupted. *Id.* Witnesses directed Putnal "toward a red car which they said contained the shooters." *Id.* He approached that car, but then saw two people sitting in another vehicle, a truck. *Id.* One of the truck's passengers, Wendell Baker, "turned in Putnal's direction . . . [and] Putnal shot and killed [him]." *Id.* While a pistol was recovered from the truck, the plaintiffs denied Baker "was holding a pistol" when shot. *Id.* at 196. In other words, a jury could have found Baker was not holding a gun when Putnal killed him.

74

It is not hard to grasp the key difference between *Baker* and this case. When shot, Baker was *possibly not even holding a gun.* When shot, Cole was *undisputedly holding a gun.* Imagine this conversation between a police officer and the police department's lawyer:

OFFICER:   I heard the Fifth Circuit just decided this *Baker* case. What does it tell me I should or shouldn't do in the field?

LAWYER:   Well, *Baker* says you lose qualified immunity if you shoot someone sitting in a car doing nothing more threatening than just turning in your direction. In other words, someone you don't even see holding a weapon.

OFFICER:   Makes sense. But tell me this. What if the person I approach *is* holding a gun?

LAWYER:   Well, *Baker* doesn't speak clearly to that situation. I mean, the jury in *Baker* could have found the guy didn't even have a gun in his hand when the officer shot him.

In other words, contrary to the majority's view, *Baker* could not have "established clearly that Cassidy's and Hunter's conduct . . . was unlawful" when they shot Cole as he emerged from the woods with his finger on the trigger of a loaded gun. Maj. at 16. To guide officers in the field, a controlling precedent must be "sufficiently clear that every reasonable [officer] would have understood that what he is doing violates" the Constitution. *Mullenix*, 136 S. Ct. at 308 (cleaned up). *Baker* does not come close.

The officers deserve qualified immunity on the excessive force claims. I respectfully dissent.